**LAW REPUBLIC, APC**
**Robert Gevorkian (SBN 333384)**
**460 S. Central Ave.**
**Glendale, CA 91204**
**Tel: 818-243-3030**
**Email:** Robert.Gevorkianesq@gmail.com

**Attorney for Plaintiff,**
**G&K Foundation**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| G&K FOUNDATION, | Case No. 22VECV01402 |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | |
| HEALTHCARE REALTY TRUST, INCORPORATED, HEALTHCARE REALTY SERVICES LLC, HR OF CALIFORNIA, LLC and DOES 1-25, INCLUSIVE, | 1. **BREACH OF CONTRACT**<br>2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>3. **MISREPRESENTATION**<br>4. **CONTRSUCTIVE EVICTION**<br>5. **BREACH OF FIDUCIARY DUTY**<br>6. **DECLARATORY RELIEF** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1. Plaintiff, G&K Foundation ("Tenant" or Plaintiff") is a tenant at 7325 Medical Center Dr. Suite 102, West Hills, CA, 91307, a building owned and/or managed by

Healthcare Realty Services, LLC.("Landlord" or "Defendant") and as agent for HR of California LLC.

2. This amendment concerns addition of defendants Healthcare Realty Services, LLC and its purported subsidiary or principle, HR of California, LLC. in an action of a breach of contract, refusal to honor a renewal option to tenant by landlord, and its agent HR of California, also failure of duty to negotiate in good faith by landlord.

3. Healthcare Realty Trust is the parent company of Healthcare Realty Services, LLC. and HR of California, and exercises control over both above mentioned companies, which also has it's Company logo, Branding posted throughout the building, and letterheads.

4. On or about November 14, 2017, Plaintiff G&K entered into a written commercial lease contract for 7325 Medical Center Dr., Unit# 102, West Hills, CA 91307, by signing a lease renewal amendment, between G&K Foundation and Healthcare Realty Services, LLC. and HR of California Plaintiff has been a tenant of the subject premises since 2012, and has always paid its rent on time. G&K has been an exemplary tenant. Plaintiff has never provided any signs of desire to leave, instead has always shown a desire to stay and continue the lease, renew without any interruptions.

5. Accordingly, in or about November 10th, 2022, Plaintiff and Defendant began negotiations for lease renewal and exercise of tenant renewal option, which landlord denied to the tenant, in violation of at the time current active lease agreement, and proposed an unconscionable terms for renewal, stating terms with a statement that lease rate is "Not Negotiable", "NON STARTER".

6. In taking the actions alleged herein, Healthcare Realty Services, HR of California, and Healthcare Realty Trust, Incorporated. (Parent Company), were engaged in a single breach of a written contract as a whole, and should respond as a whole for the

liabilities arising from their actions.

## THE PARTIES

7.  Plaintiff is and at all times relevant herein is a California Corporation. Its sole member, CaerfirstRx Pharmacy, is and all time relevant herein, is the DBA registered in California, with principle place of business 7325 Medical Center Dr. Suite 102, West Hills, CA 91307.

8.  Defendant Healthcare Realty Services, is and, at all time relevant herein, was a Tennessee limited liability company, with its principle place of business in Los Angeles, CA.

9.  Defendant HR of California, LLC, is and, at all time relevant herein, was a Alabama limited liability company, with its principle place of business in 2710 Gateway Oaks Dr. Suite 150N, Sacramento, CA, and 6801 Park Terrace Dr., Suite 545, Los Angeles, CA 90045.

10. Defendant Healthcare Realty Trust, Incorporated, is and, at all time relevant herein, was a Maryland corporation with its principle place of business in Nashville, Tennessee.

11. Plaintiff is unaware of the names of Defendants identified herein as DOES 1-25, inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and thereon alleges, that Defendants sued herein as DOES are responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants, and each of them. Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of the DOE Defendants, and the roles they played, once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

**JURISDICTION AND VENUE**

12. Venue is appropriate in the Superior Court for the County of Los Angeles, not this District Court. The Plaintiff and at least one of the Defendants are citizens of the California, and reside in the County of Los Angeles, and the events, facts and circumstances giving rise to this lawsuit all occurred primarily within the County of Los Angeles.

**GENERAL ALLEGATIONS**

13. On or about November 14, 2017, Plaintiff G&K entered into a written commercial lease contract for 7325 Medical Center Dr, Unit# 102, West Hills, CA 91307, by signing a lease renewal amendment. Plaintiff has been a tenant of the subject premises since 2012, and has always paid its rent on time. G&K has been an exemplary tenant. Plaintiff has never provided any signs of desire to leave, instead has always shown a desire to stay and continue the lease, renew without any interruptions.

14. Accordingly, in or about November 17th, 2017, Plaintiff and Defendant entered into a written contract to renew the lease for additional 5 year term, with 1 additional tenant options to renew the lease, extending an existing tenant and landlord relationship.

15. Plaintiff fully performed under the written contract, and timely paid all monthly rents in accordance to the written lease (EXHIBIT A) and renewal contract EXHIBIT B). Defendant's realtor contacted the Plaintiff inquiring if Plaintiff plans to exercise its option to renew the lease. Plaintiff notified the Defendant's realtor that Plaintiff does intend to remain at the current location, and exercise the lease option. Thereafter, Defendant's realtor agreed to provide an offer to renew the lease for the premises occupied by Plaintiff.

16. Defendant presented an oral offer to Plaintiff, via Defendant's realtor approximately

around November 10 of 2021. Plaintiff, immediately brought to Defendant's attention, that the rate offered by the landlord, (Defendant), was extremely high (unreasonably high), and Defendant's realtor acknowledged that it is high, but he stated the rate was not negotiable. However, the negotiations between Plaintiff and Defendant continued for several months. Plaintiff made several requests to hire a professional appraiser within 60 days of the negotiation, per lease term (Section G), each request was rejected by the Defendant, in violation of the lease contract, and lease renewal contract.

17. After several requests by Plaintiff to hire a professional appraiser to determine a reasonable rate, per section 2 of lease renewal contract, and Section G of the lease, (EXHIBIT A), Defendant refused to do so, in violation of a contract term. Plaintiff notified the Defendant of an implied duty of good faith and fair dealing. Plaintiff also notified the Defendant of a breach of contract, by violating a contract term. Defendant's realtor notified the Plaintiff of the rate being non negotiable, (lower rate being non-starter) again. Defendant claimed that the rate offered $4.17 per square foot must show on the lease contract as the lease rate, therefore it is not negotiable, "take it or leave it".

18. Plaintiff continued to negotiate in good faith, believing that Defendant is being truthful. Plaintiff made multiple offers, which Defendant rejected all. Additional negotiations continued for several months, then Defendant's attorney joined the negotiations. Defendant's attorney also notified the Plaintiff that the rate of $4.17 per square foot, was not negotiable "non-starter." Defendant requires that rate to show on the lease contract. Plaintiff made additional offers and reassured the Defendant and their attorney of prioritizing a lease extension to remain at the property. Defendant rejected all the offers from the Plaintiff.

19. Plaintiff again reminded the Defendant of duty of good faith and fair dealing, but

**LAW REPUBLIC, APC**
**Robert Gevorkian (SBN 333384)**
**460 S. Central Ave.**
**Glendale, CA 91204**
**Tel: 818-243-3030**
**Email:** Robert.Gevorkianesq@gmail.com

**Attorney for Plaintiff,**
**G&K Foundation**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| G&K FOUNDATION, | Case No. 22VECV01402 |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | 1. **BREACH OF CONTRACT** |
| | 2. **BREACH OF IMPLIED** |
| HEALTHCARE REALTY TRUST, | **COVENANT OF GOOD FAITH** |
| INCORPORATED, HEALTHCARE | **AND FAIR DEALING** |
| REALTY SERVICES LLC, HR OF | 3. **MISREPRESENTATION** |
| CALIFORNIA, LLC and DOES 1-25, | 4. **CONTRSUCTIVE EVICTION** |
| INCLUSIVE, | 5. **BREACH OF FIDUCIARY DUTY** |
| | 6. **DECLARATORY RELIEF** |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

### NATURE OF THE ACTION

1.  Plaintiff, G&K Foundation ("Tenant" or Plaintiff") is a tenant at 7325 Medical
Center Dr. Suite 102, West Hills, CA, 91307, a building owned and/or managed by

---

FIRST AMENDED COMPLAINT                                                    1

Healthcare Realty Services, LLC.("Landlord" or "Defendant") and as agent for HR of California LLC.

2. This amendment concerns addition of defendants Healthcare Realty Services, LLC and its purported subsidiary or principle, HR of California, LLC. in an action of a breach of contract, refusal to honor a renewal option to tenant by landlord, and its agent HR of California, also failure of duty to negotiate in good faith by landlord.

3. Healthcare Realty Trust is the parent company of Healthcare Realty Services, LLC. and HR of California, and exercises control over both above mentioned companies, which also has it's Company logo, Branding posted throughout the building, and letterheads.

4. On or about November 14, 2017, Plaintiff G&K entered into a written commercial lease contract for 7325 Medical Center Dr., Unit# 102, West Hills, CA 91307, by signing a lease renewal amendment, between G&K Foundation and Healthcare Realty Services, LLC. and HR of California Plaintiff has been a tenant of the subject premises since 2012, and has always paid its rent on time. G&K has been an exemplary tenant. Plaintiff has never provided any signs of desire to leave, instead has always shown a desire to stay and continue the lease, renew without any interruptions.

5. Accordingly, in or about November 10th, 2022, Plaintiff and Defendant began negotiations for lease renewal and exercise of tenant renewal option, which landlord denied to the tenant, in violation of at the time current active lease agreement, and proposed an unconscionable terms for renewal, stating terms with a statement that lease rate is "Not Negotiable", "NON STARTER".

6. In taking the actions alleged herein, Healthcare Realty Services, HR of California, and Healthcare Realty Trust, Incorporated. (Parent Company), were engaged in a single breach of a written contract as a whole, and should respond as a whole for the

liabilities arising from their actions.

## THE PARTIES

7. Plaintiff is and at all times relevant herein is a California Corporation. Its sole member, CaerfirstRx Pharmacy, is and all time relevant herein, is the DBA registered in California, with principle place of business 7325 Medical Center Dr. Suite 102, West Hills, CA 91307.

8. Defendant Healthcare Realty Services, is and, at all time relevant herein, was a Tennessee limited liability company, with its principle place of business in Los Angeles, CA.

9. Defendant HR of California, LLC, is and, at all time relevant herein, was a Alabama limited liability company, with its principle place of business in 2710 Gateway Oaks Dr. Suite 150N, Sacramento, CA, and 6801 Park Terrace Dr., Suite 545, Los Angeles, CA 90045.

10. Defendant Healthcare Realty Trust, Incorporated, is and, at all time relevant herein, was a Maryland corporation with its principle place of business in Nashville, Tennessee.

11. Plaintiff is unaware of the names of Defendants identified herein as DOES 1-25, inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and thereon alleges, that Defendants sued herein as DOES are responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants, and each of them. Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of the DOE Defendants, and the roles they played, once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

## JURISDICTION AND VENUE

12. Venue is appropriate in the Superior Court for the County of Los Angeles, not this District Court. The Plaintiff and at least one of the Defendants are citizens of the California, and reside in the County of Los Angeles, and the events, facts and circumstances giving rise to this lawsuit all occurred primarily within the County of Los Angeles.

## GENERAL ALLEGATIONS

13. On or about November 14, 2017, Plaintiff G&K entered into a written commercial lease contract for 7325 Medical Center Dr, Unit# 102, West Hills, CA 91307, by signing a lease renewal amendment. Plaintiff has been a tenant of the subject premises since 2012, and has always paid its rent on time. G&K has been an exemplary tenant. Plaintiff has never provided any signs of desire to leave, instead has always shown a desire to stay and continue the lease, renew without any interruptions.

14. Accordingly, in or about November 17th, 2017, Plaintiff and Defendant entered into a written contract to renew the lease for additional 5 year term, with 1 additional tenant options to renew the lease, extending an existing tenant and landlord relationship.

15. Plaintiff fully performed under the written contract, and timely paid all monthly rents in accordance to the written lease (EXHIBIT A) and renewal contract EXHIBIT B). Defendant's realtor contacted the Plaintiff inquiring if Plaintiff plans to exercise its option to renew the lease. Plaintiff notified the Defendant's realtor that Plaintiff does intend to remain at the current location, and exercise the lease option. Thereafter, Defendant's realtor agreed to provide an offer to renew the lease for the premises occupied by Plaintiff.

16. Defendant presented an oral offer to Plaintiff, via Defendant's realtor approximately

FIRST AMENDED COMPLAINT                                    4

around November 10 of 2021. Plaintiff, immediately brought to Defendant's attention, that the rate offered by the landlord, (Defendant), was extremely high (unreasonably high), and Defendant's realtor acknowledged that it is high, but he stated the rate was not negotiable. However, the negotiations between Plaintiff and Defendant continued for several months. Plaintiff made several requests to hire a professional appraiser within 60 days of the negotiation, per lease term (Section G), each request was rejected by the Defendant, in violation of the lease contract, and lease renewal contract.

17. After several requests by Plaintiff to hire a professional appraiser to determine a reasonable rate, per section 2 of lease renewal contract, and Section G of the lease, (EXHIBIT A), Defendant refused to do so, in violation of a contract term. Plaintiff notified the Defendant of an implied duty of good faith and fair dealing. Plaintiff also notified the Defendant of a breach of contract, by violating a contract term. Defendant's realtor notified the Plaintiff of the rate being non negotiable, (lower rate being non-starter) again. Defendant claimed that the rate offered $4.17 per square foot must show on the lease contract as the lease rate, therefore it is not negotiable, "take it or leave it".

18. Plaintiff continued to negotiate in good faith, believing that Defendant is being truthful. Plaintiff made multiple offers, which Defendant rejected all. Additional negotiations continued for several months, then Defendant's attorney joined the negotiations. Defendant's attorney also notified the Plaintiff that the rate of $4.17 per square foot, was not negotiable "non-starter." Defendant requires that rate to show on the lease contract. Plaintiff made additional offers and reassured the Defendant and their attorney of prioritizing a lease extension to remain at the property. Defendant rejected all the offers from the Plaintiff.

19. Plaintiff again reminded the Defendant of duty of good faith and fair dealing, but

Defendant's attorney disagreed, stating again that the Defendant requires the rate of $4.17 to show on the lease agreement, and that rate is not negotiable, but since Defendant has offered to wave approximately $600 of CAM chargers, Defendant did it in good faith.

20. The lease term was coming to an end on March 31st, 2022, but negotiations between Plaintiff and Defendant continued. Defendant's attorney assured not to worry about the end of the lease date, since negotiations are on going. On and approximate June 3rd, 2022, Plaintiff obtained written information that the unit that is occupied by the Plaintiff is being offered for lease. Defendant's realtor listed the unit for rent for $3.00 per square foot. Plaintiff confronted the Defendant's attorney of the rate discrepancy, Defendant's offer of non-negotiable rate of $4.17 per square foot to Plaintiff, and $3.00 per square foot to the public (Public is everyone who is interested to lease the space), Intentionally lying to Plaintiff about the rate being non-negotiable. Defendant's attorney notified the Plaintiff that the current offer made by the Defendant to Plaintiff is terminated, and the Defendant, was angered due to the fact that Plaintiff obtained the listing information from his realtor, therefore terminates the outstanding offer. Defendant did not wish to continue the negotiations. At the time, there was also an outstanding offer made by the Plaintiff, which Plaintiff also withdrew, due to newly obtained information.

21. Plaintiff still attempted to continue negotiations with Defendant, and presented a new offer to the Defendant's attorney, above the asking rate of the Defendant. Defendant, never responded to the offer. Plaintiff extended the expiration date of the offer several times, but Defendant still failed to respond.

22. On and about August 31st, 2022, Plaintiff received a 30 day eviction letter from the Defendant's attorney. Therefore as a proximate result of the above breaches of the written lease contract, and lease renewal contract, along with intentional

FIRST AMENDED COMPLAINT

misrepresentations by Defendant, his realtor and his attorney, there are current damages and future damages to the Plaintiff for the recovery of $2,775,000.00 plus attorney's fees. The $2,77500.00 damages are part of the expenses plaintiff suffered searching for a new location, research and preparation done for new locations, time spent on negotiations, and searching for a new location, and lose of business due to refusal to further negotiations, which amount subject to proof at trial.

## FIRST CAUSE OF ACTION

**(Breach of Contract against the Defendants Healthcare Realty Trust, Incorporated, Healthcare Realty Services, LLC., HR of California LLC. and Does 1-25, Inclusive)**

23. Plaintiff repeats, reiterates and incorporates herein by reference the allegations of paragraphs 1 through 22, inclusive as if set forth fully herein.

24. In or about November 17th, 2017, Plaintiff and Defendant entered into a written lease renewal contract for 7325 Medical Center Dr. #102, West Hills, CA 91307. Under the written contract Plaintiff was entitled to a tenant option for an additional 5 year term. Per section G of the lease contract, Plaintiff was entitled to a professional appraisal when the rental rate is in dispute. Plaintiff made several requests to obtain an appraisal, which triggered a duty o perform by Defendant. Defendant rejected all requests, and breached the contract.

25. The Plaintiff did all, or substantially all, of the significant things that the contract required him to do. The Plaintiff made all monthly payments to the Defendant, and Defendant accepted all of the monthly payments.

26. All conditions requiring Defendants' obligation to hire an appraiser if the rental rate for renewal is disputed, occurred. Yet Defendant breached the written contract with Plaintiff by refusing to obtain an appraisal.

27. Plaintiff has suffered harm in that the Defendant refuses to obtain an appraisal, and

provide a fair market rate, the same rate he has offered the public. Defendant's breach of the written contract substantially caused Plaintiff harm.

### SECOND CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendants Healthcare Realty Trust, Incorporated, Healthcare Realty Services, LLC, HR of California, LLC., and Does 1-25, Inclusive)**

28.  Plaintiff repeats, reiterates, and incorporates herein by reference the allegations of paragraphs 1 through 27, inclusive, as if set forth fully herein.

29. In or about November 17th, 2017, Plaintiff and Defendant entered into an oral contract for the lease of 7325 Medical Center Dr. #102, West Hills, CA 91307. Section 2 of the renewal contract, Plaintiff is entitled to a tenant option of an additional 5 year lease term to be at fair market rate, and if the rate at the time of negotiations is disputed, landlord to provide the tenant (Plaintiff) an appraisal.

30. Plaintiff did notify the Defendant of wanting to exercise the tenant option, and notified that Defendant of the unreasonable rate offer by the Defendant. Plaintiff also requested for the Defendant to obtain a professional appraisal to determine fair market rate. Defendant refused to obtain an appraisal report, therefore failing to perform in accordance to the written lease contract, and refusing to negotiate the unreasonable rate, intentionally misrepresenting their position. Defendant also, took the position of "take it or leave it." Defendant failed to negotiate in good faith by 1st. presenting and unreasonable, unconscionable rate, and 2nd, intentionally misrepresented their position, by stating the rate of $4.17 was required for their lease paperwork, "rate is a non-starter", while listing the same unit at $3.00 for the public to lease.

31. As a direct and proximate result of these breaches of the written contract described herein, Plaintiff has been damaged and faces the prospect of further damages in an

amount to be proven at the trial, but in excess of the jurisdiction of this Court.

## THIRD CAUSE OF ACTION

**(Intentional Misrepresentation Against the Defendant Healthcare Realty Trust, Incorporated, Healthcare Realty Services, LLC., HR of California, LLC., and Does 1-25, his Attorney, and his Realtor to Plaintiff)**

32. Plaintiff repeats, reiterates, and incorporates herein by reference the allegations of paragraphs 1 through 31, inclusive, as if set forth fully herein.

33. Defendant Healthcare Realty Trust, Inc. their Realtor Jacob Mumper and Cooper W. Collins, made false statements that rate offered by the Defendant of $4.17 is non-negotiable due to the fact that is required by the Defendant to show the rate on the lease contract.

34. At the time of this false statement, Defendant did know that there is no legal or any other requirement that existed at the time the statement was made to Plaintiff. Since, the Defendant listed the same property for lease for much lower rate of $3.00 per square foot, which Plaintiff did obtain documentation in writing from Defendant's Realtor, stating that the property (unit 102) Defendant is seeking to lease to general public for $3.00 per square foot, eliminating a requirement of $4.17 showing on a lease agreement.

35. Defendant, Healthcare Realty Trust, Inc., intended that Plaintiff G&K Foundation rely on the false statement and enter or reject the lease agreement. It was reasonable for the Plaintiff to rely on the false statement given by the Defendant, since many banks require lease agreements, and provide loans based on the lease rates stated on the lease agreements.

36. As a direct and proximate result of the false statement by the Defendant, his Attorney and his Realtor, the Plaintiff has been harmed in that they have been intentionally misrepresented their position during negotiations, and done so in bad

---

FIRST AMENDED COMPLAINT                                    9

faith.

## FOURTH CAUSE OF ACTION

**(Constructive Eviction Against Defendant Healthcare Realty Trust, Incorporated, Healthcare Realty Services, LLC., HR of California LLC., and Does 1-25, Inclusive)**

37.  Plaintiff repeats, reiterates, and incorporates herein by reference the allegations of paragraphs 1 through 36, inclusive, as if set forth fully herein.

38. Defendant offered an unreasonable, unconscionable rate for lease renewal to the Plaintiff, at the time as Defendant offers much lower rate $1.17 lower rate to public at large for the same commercial rental space. Defendant also refused to obtain an appraisal, since there is a rent rate dispute during rent renewal negotiations. Defendant has also stopped all negotiations, and served Plaintiff with a 30 day notice of eviction.

39. Plaintiff, according to the renewal contract, has a right to a 1 five year option to renew at a market rate at the time of the renewal. Defendant failed to provide a market rate, instead provided a much higher rate then the market rate to the Plaintiff, while offering much lower rate, true market rate to the public. Defendant is forcing Plaintiff to vacate the space.

40. Defendant Healthcare Realty Trust, Inc., intended to push the Plaintiff out, by offering unconscionable rate of renewal, and intentionally misrepresenting that the rate offered is "take it or leave it," since it must show on lease agreement. As a direct and proximate result of the Defendant's actions offering an unconscionable rate, and stating it is take it or leave it. In addition, Defendant's action to reject the Plaintiff's option, the Plaintiff has been damaged in the amount to be proven at trial, but in excess of the jurisdiction of this Court.

## **FIFTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty Against Defendants Healthcare Realty Trust
Incorporated., Healthcare Realty Services, LLC, HR of California LLC., and
Does 1-25, Inclusive)**

41. Plaintiff repeats, reiterates, and incorporates herein by reference the allegations of
paragraphs 1 through 40, inclusive, as if set forth fully herein.

42. Defendants, Healthcare Realty Trust, Inc., HR of California, Landlord, working
within the scope of their employment, breached their fiduciary duty as landlord to
tenant, when they refused to honor the Plaintiff, the renewal option, which was
granted to the Plaintiff during original lease contract and lease renewal contract
between Plaintiff and Defendant.

43. Defendants voluntarily accepted a fiduciary role with respect to Plaitiff, including
the duty to act with the utmost good faith, loyalty, and in the best interests of
Plaintiff, by entering into a landlord, tenant relationship. As Landlord has a fiduciary
duty to his/her tenants, to deal in good faith and fair dealing. Tenant and Landlord
relationship, creates a fiduciary duty to act in good faith, which Landlord breached.

44. Defendant failed to grant Plaintiff his lease renewal option, and failed to negotiate
with the current tenant in good faith to renew the lease contract, at the time when
current lease was still active. The new lease renewal negotiations began on
November 10th, 2021, and current lease expired on April 1, 2022. Within that period,
Defendant refused to grant the renewal option to the Plaintiff.

45. The negotiations continued between the Defendant and Plaintiff, and on several
occasions, Defendant's previous Attorney, assured the Plaintiff not to worry about
expiring lease, since negotiations between Defendant and Plaintiff are on going.

46. Plaintiff on several occasions presented verbal, and written offers to renew the lease,

which Defendant rejected, and continuously stated that rate negotiations are "non-starters". Plaintiff made additional offers to adjust the terms other then the rate, which Defendant also rejected, without providing any explanations, or counteroffers.

47. Defendant's previous attorney and realtor also, on several occasions verbally admitted that the rate offered by the Defendant is high, in comparison with the market rate at the time. Yet, when brought to Defendant's attention, Defendant continued to repeat that offer for renewal is "take it or leave it", failing to negotiate in good faith, therefore breaching a fiduciary duty to Plaintiff.

48. Defendants, Healthcare Realty Trust, Inc., Healthcare Realty Services, LLC, and HR of California failed to act as a reasonably careful landlord would have acted under the same or similar circumstances.

49. As a direct result, Plaintiff was harmed.

50. Defendants' conduct was a substantial factor in causing Plaintiff's harm. WHEREFORE, Plaintiff plays for relief as set forth below.

## SIXTH CAUSE OF ACTION

**(Declaratory Relief Against Defendants Healthcare Realty Trust Incorporated., Healthcare Realty Services, LLC, HR of California LLC., and Does 1-25, Inclusive)**

51. Plaintiff repeats, reiterates, and incorporates herein by reference the allegations of paragraphs 1 through 39, inclusive, as if set forth fully herein.

52. Plaintiff seeks any order by the Court declaring that the written lease renewal contract from 2017, are valid and enforceable, and that specific performance be granted requiring Defendants Healthcare Realty Trust, Inc. and Does 1-25, to renew the lease for the unit 102, for $3.00, same rate as Defendant offered to the public. In addition, Plaintiff seeks for court to grant a preliminary injunction, to stop the Defendant from evicting the Plaintiff, until the end of the trial or settlement,

---

FIRST AMENDED COMPLAINT                    12

whichever comes first.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray for judgment against Defendants Healthcare Realty Trust, Inc., and Does 1-25, inclusive, and each of them, as follows:

1. Declaratory relief and an order of specific performance requiring Defendants Healthcare Realty Trust, Inc., Healthcare Realty Services Inc., HR of California Inc., and Does 1-25 to renew the lease and provide the Plaintiff's option to renew the lease at a rate it is offering to the public;

2. Compensatory, restitution according to proof at trial;

3. Preliminary Injunction to stop the eviction process

4. Cost of suit and prejudgment interest at the highest legal rate;

5. Attorney Fees per Section 41 of the lease

6. For such other and further as the Court deems just and proper.

**LAW REPUBLIC, APC**

Dated: _10-20-22_                _____
                                Robert Gevorkian
                                Attorney for Plaintiffs G&K Foundation

## DEMAND FOR JURY TRIAL

Plaintiff G&K Foundation hereby demands a trial by jury of all issues so triable.

**Law Republic, APC**

DATED: 10-20-22            BY: _____

Robert Gevorkian,
Attorney for Plaintiff G&K Foundation

_____

EXHIBIT A

# LEASE AGREEMENT

## SUITE NO. 102

7325 Medical Center Drive, West Hills, California 91307

Dated: February 1, 2012

### NOTICE TO ALL PARTIES:

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION, NEGOTIATION AND/OR SIGNATURE DOES NOT CONSTITUTE AN OFFER TO LEASE, OR A RESERVATION OF, OR AN OPTION FOR THE PREMISES. THIS DOCUMENT SHALL NOT BE BINDING AND IN EFFECT AGAINST EITHER PARTY UNTIL AT LEAST ONE COUNTERPART, DULY EXECUTED BY LANDLORD AND TENANT, HAS BEEN RECEIVED BY EACH OF LANDLORD AND TENANT, AND WHERE NECESSARY, THIS LEASE HAS BEEN APPROVED BY LANDLORD'S LENDER.

# LEASE AGREEMENT

This Lease Agreement is made and entered into February 1, 2012 ("Execution Date") by and between Manor Park, LLC (hereinafter "Landlord") and G&K Foundation, a non-profit Public Benefit Corporation, *DBA CareFirst RX* (hereinafter "Tenant").

## 1. BASIC LEASE PROVISIONS

A. *Building.* The term "the Building" shall mean that certain medical office building located at 7325 Medical Center Drive, West Hills, CA 91307, along with the land on which the Building is located, and other improvements thereon, including, without limitation, public area improvements, the parking structure, walls, floor coverings, elevators, Premises Improvements, as hereinafter defined, and landscaping.

B. *Leased Premises.* The term "Leased Premises" shall mean (i) approximately one thousand three hundred and fourteen (1,314) square feet of rentable area, designated as Suite #102 in the Building, as outlined on Exhibit "A", attached hereto and incorporated herein by reference (the "Leased Premises" herein), which includes a fourteen percent (14%) load factor representing Tenant's allocable share of the common areas of the Building.

C. *Lease Term.* Sixty (60) months, plus such additional days as may be required to cause this Lease to terminate on the final day of the calendar month.

D. *Commencement Date.*        April 1, 2012.

E. *Rent Commencement Date.* April 1, 2012.

F. *Expiration Date.*            60 full months after the Commencement Date

G. *Option Term.* Tenant shall have two (2) five (5) year options to extend the lease by providing written notice to the Landlord not less than six (6) months prior to the expiration of the lease term and no more than twelve (12) months before. The rent payable by Tenant during the option term shall be equal to the then-market rent for the Premises, but in no event shall it be less than Tenant's current rent. If Landlord and Tenant are unable to agree upon such a fair market rent within sixty (60) days of the option being exercised, then both parties shall employ a licensed appraiser to determine the fair market rent, and if the two appraisers arrive at a Base Rent with no more than a five percent (5%) differential, then the Base Rent shall be the average of the two appraisals. If the differential is more than five percent (5%), and if the parties are again unable to agree upon the Base Rent, than the two appraisers shall select a third licensed appraiser who shall determine the Base Rent, except that in no event shall the Base Rent as so determined be less than the lower of the Base Rent as determined by Landlord's or Tenant's appraiser, nor greater than the higher of the Base Rent determined by Landlord's or Tenant's appraiser. Landlord and Tenant shall each pay the cost of their appraiser and shall split the cost of the third appraiser,

2

if required. All appraisers shall have at least three (3) years experience in the appraisal of commercial/industrial real property in the market area and shall be members in good standing of professional real estate appraisal organizations.

H. *Initial Fixed Rent.* Forty-Two thousand Five hundred Seventy-Three dollars and 60/100ths ($42,573.60) per year, payable in monthly installments of Three thousand Five hundred Forty-Seven dollars and 80/100ths ($3,547.80) per Section 5.1 of the Lease.

I. *Rental Adjustments.*    Base Rent shall be increased by three percent (3%) per annum commencing in the 25th month of the Term, April 1, 2014.

J. *Base Rent for Option Term.* See 1G – *Option Term*

K. *Security Deposit.* Three thousand Eight hundred Seventy-Seven dollars ($3,877.00)

L. *Base Year.* The twelve (12) month period ending December 31, 2012.

M. *Tenant's Proportionate Share.* 3.07%. Tenant's Proportionate Share shall be equal to a fraction, the numerator of which shall be the number of gross square feet of area within the Leased Premises (1,314 square feet) and the denominator of which shall be the gross square feet of area in the Building (42,780 square feet).

N. *Notice Addresses.*

| Landlord: | Manor Park, LLC |
|---|---|
| | Attn: David Azouz |
| | 12441 Ventura Court |
| | Studio City, CA 91604 |

| Tenant: | G&K Foundation, a non-profit Public Benefit Corporation |
|---|---|
| | Attention: Robert Gevorkian |
| | 7325 Medical Center Drive, #102 |
| | West Hills, CA 91307 |

O. *Permitted Use.* Pharmacy and related uses and for no other use.

P. *Guarantors.* Robert Gevorkian

Q. *Brokers.*     *Landlord's Broker.* Angie Weber – Medical Asset Management
*Tenant's Broker.* Angie Weber – Medical Asset Management

R. *Exhibits.*

Exhibit A – Outline of Space
Exhibit B – Description of Landlord's Work
Exhibit C – Rules and Regulations
Exhibit D – Addendum Provisions

3

R 6

The Basic Lease Provisions are incorporated into and made a part of the Lease; provided, however, that in the event of any conflict between any Basic Lease Provision and a specific term of the Lease, the specific term of the Lease shall control.

2. *LEASED PREMISES.* In consideration of the rents and covenants herein stipulated to be paid and performed by Tenant, and upon and subject to the terms, covenants, conditions and provisions contained in this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises.

3. *TERM.*

3.1. *Term.* Subject to the provisions of Section 3.2 hereof, the Lease Term shall commence on the Commencement Date, and shall terminate on the Expiration Date, both dates inclusive. The term "Lease Year" as used herein shall mean, initially, the twelve (12) month period commencing on the Commencement Date and ending on the last day of the twelfth calendar month following the Commencement Date.

3.2. *Failure to Deliver Possession.* In the event that Landlord is unable to deliver possession of the Leased Premises to Tenant by the Commencement Date as a result of causes beyond its reasonable control, including, without limitation, any of those causes set forth in Section 20.3 hereof, Landlord shall not be subject to any liability for such failure to deliver possession. No such failure to deliver possession on the Commencement Date shall in any way affect or impair the validity of this Lease or the obligations of Tenant under the terms, covenants, conditions and provisions of this Lease provided, however, that Tenant's obligation to pay Net Rent, as hereinafter defined, shall not commence until the earlier of the date which is ten (10) days after Landlord gives Tenant notice (herein called "Occupancy Notice") that the Leased Premises are available for occupancy by Tenant or the date on which Tenant takes possession of the Leased Premises; provided, further, that in the event of any such failure by Landlord to deliver possession by the Commencement Date, the term of this Lease shall be extended for a number of days equal to the number of days intervening between the Commencement Date and the date on which Tenant becomes obligated to pay Net Rent as provided for herein; provided, further, that if Landlord fails to give Occupancy Notice to Tenant within ninety (90) of the Commencement Date, at any time thereafter but prior to entering into possession of the Leased Premises, Tenant shall have the right to terminate this Lease by giving Landlord notice thereof.

3.3. *Condition of Premises.* Subject to (i) the Landlord's completion of any work contained on Exhibit B hereto ("Landlord's Work"), and (ii) the Landlord's maintenance and repair obligations, as contained in Section 12.2 of the Lease, Tenant hereby accepts the entire Leased Premises in their as is condition, as existing as of the date of this Lease. Tenant acknowledges that neither Landlord nor any representative of Landlord has made any representation or warranty with respect to the Leased Premises or the Building or the suitability or fitness of either for any purpose, except as set forth in this Lease. However, Landlord hereby represents that to the best of its knowledge, the Premises are in compliance with all applicable laws and all Building systems are fully operational. The taking of possession or use of the Leased Premises by Tenant shall conclusively establish that the Leased Premises and the Building were in satisfactory condition and in conformity with the provisions of this Lease in all respects, except for those matters which Tenant shall have brought to Landlord's attention by

4

delivery of a written punch list. The list shall be limited to any items (i) which are the obligation of Landlord pursuant to Section 12.2 hereof, or (ii) which are part of Landlord's Work.

3.4. *Quiet Enjoyment.*  Landlord agrees that Tenant, upon paying the Net Rent, and performing and observing all other terms, covenants, conditions and provisions to be performed or observed by Tenant under this Lease, shall quietly have and enjoy the Leased Premises during the term of this Lease without hindrance or molestation by Landlord or by anyone claiming by, through or under Landlord, subject, however, to the terms, covenants, conditions and provisions of this Lease.

## 4.    USE OF LEASED PREMISES.

4.1. *Specific Use.*  Tenant shall use and occupy the Leased Premises for the use specified in Section O of the Basic Lease Provisions, and for no other purpose whatsoever without the prior written consent of Landlord.

4.2. *Dangerous Materials.*  Tenant shall not do, bring, or keep anything in, on or about the Leased Premises that will cause a cancellation of any insurance policy insuring the Building or to be maintained by Tenant pursuant to Section 13 hereof or an increase in the premiums therefore.    Without limiting the generality of the foregoing, Tenant and Tenant's Representatives, as hereinafter defined, shall not use, keep, or store any materials of a dangerous or highly flammable nature in any form upon the Leased Premises.

4.3. *Compliance with Laws.*  Tenant shall comply with all federal, state and local laws, rules, orders, ordinances, directions, regulations and requirements (herein called "Law" or "Laws") of all governmental agencies, offices, departments, bureaus and boards having jurisdiction (herein called "Governmental Authority") over the Leased Premises or Tenant's use thereof, and Tenant shall, at Tenant's sole cost, alter, maintain, and restore the Leased Premises in compliance and conformity with all Laws relating to the condition, use, or occupancy thereof; provided, however, that Tenant shall not be obligated to comply with any Law that requires alteration, maintenance, or restoration of the Leased Premises unless such alteration, maintenance or restoration results from Tenant's particular and specific use of the Leased Premises.

4.4. *Medical Waste; Non Building-Standard Installations.*  Tenant specifically agrees that it is responsible for the proper and lawful disposal (not using Building trash receptacles), treatment, cleaning and handling of any and all medical waste, medical and surgical by-products and blood and/or blood contaminated instruments, containers or the like, and storage containers for medical gases, which Tenant, its employees, subtenants or invitees generate or which relate to Tenant's operations.  Landlord shall provide no janitorial or other services relative to the aforesaid items and such services are herein acknowledged by Tenant to be non-standard items, with Tenant being responsible for all of same.

4.5. *Prohibitions on Use.*  Tenant shall not:

(a). Use the Leased Premises in any manner that will constitute waste, nuisance, or annoyance to other tenants in the Building, including, without limitation, the emission of

5

noxious or offensive odors or the use of loudspeakers or sound or light apparatus that can be heard or seen outside the Leased Premises;

(b). Conduct any restaurant, luncheonette or cafeteria for the sale of service of food or beverages to its employees or to others on the Leased Premises; or

(c). Install, use or permit the installation or use of, any vending machine without written consent of Landlord.

(d). Except for such limited quantities of medical and office materials and supplies as are customarily used in Tenant's normal business operations, use, generate, manufacture, store or dispose of, on or in the Leased Premises any flammable explosives, radioactive materials, hazardous wastes, toxic substances, environmental poisons or any similar such pollutants or contaminants, hereinafter referred to as "Hazardous Materials." The term Hazardous Materials shall include, but not be limited to, substances defined as "hazardous substances," "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq..; the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq..; and those substances defined as "hazardous wastes" in §2517 of the California Health and Safety Code or as "hazardous substances" in §25316 of the California Health and Safety Code; and in the regulations adopted and publications promulgated pursuant to said laws. The foregoing shall survive the Lease Term and shall constitute continuing representations and warranties by Tenant to Landlord, its successors and assigns. Tenant hereby agrees to indemnify and hold Landlord, and any successors to Landlord's interest in the claim of title to the Building, from and against any all liability (i) including all foreseeable and unforeseeable consequential damages, directly or indirectly arising out of the use, generation, manufacture, storage or disposal of Hazardous Materials by Tenant, any operator or subtenant of the Leased Premises during the Lease Term; and (ii) including, without limitation, the cost of any required or necessary repair, cleanup or detoxification, claimed, threatened or asserted or arising out of the use, generation, manufacture, storage or disposal of Hazardous Materials on or about the Leased Premises by Tenant, its subtenants or any operator of Tenant in the Building or the Leased Premises during the Lease Term. Tenant further agrees that it shall specifically remain in full and complete compliance of all OSHA, County of Los Angeles, and City of Los Angeles health code and safety requirements, whether or not relating to the transportation and disposition of medical wastes, and in no event shall Tenant permit said wastes to accumulate in, on or upon the Leased Premises or at any location in the Building.

4.6. *Damage to Building.* Tenant shall not do anything on or about the Leased Premises that will cause damage to the Building. No machinery, apparatus, device, equipment or other appliance (herein called "Equipment") shall be used or operated in, on or about the Leased Premises that will in any manner injure, vibrate, or shake the Building.

5. *RENT.*

5.1. *Fixed Rent.* Tenant agrees to pay Landlord as minimum rent for the Leased Premises, the annual amount and monthly installments shown in Section H. of the Basic Lease Provisions, as adjusted from time to time pursuant to the terms hereof (each of said monthly

installments is herein called "Fixed Rent"). The Fixed Rent shall be payable to Landlord without deduction, set off, prior notice, or demand, and shall be payable in advance commencing on the Execution Date for the first month or portion thereof, except as provided in Section 3.2 hereof, and thereafter on the first day of each month, continuing throughout the term of this Lease. Fixed Rent for any partial month shall be prorated at the rate of 1/30th of the Fixed Rent per day.

5.2. *Payment of Net Rent.* All Fixed Rent and Additional Rent, as hereinafter defined (Fixed Rent and Additional Rent herein collectively called "Net Rent"), shall be paid to Landlord at Landlord's office at the project or at such other place as Landlord may hereinafter designate. The term "Additional Rent" shall mean each of the amounts to be paid pursuant hereto which are hereinafter identified as "Additional Rent."

5.3. *Adjustments to Fixed Rent.* The Fixed Rent provided for in this Lease, together with any increases otherwise provided for herein, shall be subject to adjustment at the commencement of the first anniversary of the Commencement Date and each year thereafter (hereinafter referred to as the "Adjustment Date") at a rate of three percent (3%) per annum.

5.4. *Payment of Adjusted Net Rent.* Pending receipt of the required revised Index and determination of the actual adjustment, Tenant shall pay an estimated adjusted Fixed Rent, as reasonably determined by Landlord by reference to the then available Index information. Upon notification of the actual adjustment after publication of the required Index, any overpayment shall be credited against the next installment of Fixed Rent due, and any cumulative underpayment shall be immediately due and payable by Tenant. Landlord's failure to request payment of an estimated or actual rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease. In the event the compilation and/or publication of the Index shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then Landlord shall select a new index which, in Landlord's reasonable discretion, is most nearly the same as the Index used to make such calculation.

5.5. *Late Payment Charge.* Tenant agrees to pay to Landlord an amount equal to ten percent (10%) of the monthly Net Rent as reasonable compensation to Landlord for Tenant's failure to make payment within five (5) days within the date due.

6. *ADDITIONAL RENT.*

6.1. *Definitions.*

(a). "Landlord Taxes" shall mean all ad valorem real property taxes and assessments levied and assessed against the Building. If, because of any change in the method of taxation of real estate, any taxes or assessments are imposed upon Landlord and/or the Building, or the rents or income therefrom, in substitution for or in lieu of any ad valorem real property taxes or assessments, such other taxes or assessments shall be deemed to be Landlord Taxes.

(b). "Operating Costs" shall mean all costs, without duplication, paid or incurred by or on behalf of Landlord in the operation and maintenance of the Building, including all general maintenance, repairs and restoration, resurfacing, painting, re-stripping, cleaning, sweeping and janitorial services, trash removal or other maintenance for floors, sidewalks, curbs, public restrooms, garage and parking areas, driveways, retaining walls and walkways and signs,

7

landscape sprinkler systems, planting and landscaping, lighting and other utilities, directional signs and other markers and bumpers; maintenance and repair of elevators, escalators, air conditioning and heating systems for the Building; any fire protection systems, lighting systems, storm drainage systems and any other utility systems; personnel to implement such services including, if Landlord deems necessary, the cost of security guards or devices; a management fee equal to the fee that Landlord pays to the management company (including any affiliate of Landlord) which manages the Building, which shall be at a rate equal to that customarily charged for office buildings similar in size, location and character to the Building (including the rental value of any rental office space occupied by such management company in the Building); Landlord's share of real and personal property taxes and governmental charge, fees or assessments of any kind or nature on the facilities, improvements and land comprising the Building, including the Landlord Taxes, but not income or profit taxes; utilities not individually metered to tenants; the maintenance of reserves for replacements and repairs, as well as the cost of any capital improvements made to the Building by Landlord, such cost to be amortized over such reasonable period as Landlord shall determine with a return on Landlord's capital investment at the rate of eight (8%) per annum on the un-amortized balance or at such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing such capital improvements; depreciation on maintenance and operating machinery and equipment, if owned, and rentals paid for such machinery and equipment if rented; premiums for public liability, property damage, fire and extended coverage insurance (including "earthquake insurance" and "flood insurance" if Landlord deems it desirable to have such coverage), together with insurance against sprinkler damage, vandalism and malicious mischief, and any other insurance carried by Landlord on the Building. If Landlord shall contest any tax or assessment affecting the Building, the expenses incurred in such contest shall be part of the Operating Costs, regardless of whether said contest affects the Building; provided, however, that such costs shall not include (i) amounts levied, assessed, imposed or required to be paid by any Governmental Authority, as hereinafter defined, as set forth in Section 10.2 hereof or (ii) amounts paid by Landlord for real estate brokers or real estate agents' fees or commissions, (iii) Landlord's income and profit taxes; (iv) Tenant inducement costs and costs of alterations or decorating the premises of other tenants; (v) Advertising expenses incurred in connection with the marketing of any rentable space; (vi) Interest and principal payments on mortgages and other debt costs and depreciation other than those costs specifically referred to elsewhere in this Lease; (vii) all items and services for which Tenant or other tenants reimburse Landlord outside of Operating Costs and the cost of any special work or service performed for any tenant (including Tenant) at such tenant's cost; (viii) Compensation paid to officers and executives of Landlord (it is understood that property management employees may carry a title such as vice president and those officers/employees of Landlord would be allowable Operating Expenses); (xi) Costs incurred due to a violation of Law by Landlord relating to the Project.

(c). "Statement" shall mean a statement furnished by Landlord to Tenant containing a comparison of Operating Costs and Landlord Taxes for the Base Year and for the calendar year immediately preceding the calendar year in which the statement is furnished.

6.2. *Additional Rent.* In the event that in any twelve (12) month period during the term of this Lease, commencing twelve (12) months following the Commencement Date, (i) Landlord Taxes shall be increased above Landlord Taxes for the Base Year or (ii) Operating Costs shall be increased above Operating Costs for the Base Year, the Fixed Rent shall be increased by the

Tenant's Proportionate Share of the amount of such increase in Landlord Taxes and Operating Costs, with such increases be payable as herein provided as Additional Rent.

6.3. *Expense Recovery.* Prior to the first anniversary of the Commencement Date, and on each successive anniversary date thereafter during the Lease Term, Landlord shall provide Tenant with a written estimate of the amount by which Tenant's Proportionate Share of Operating Costs and Landlord Taxes for the forthcoming Lease Year (the "Expense Recovery Period") will exceed the Operating Costs and Landlord Taxes for the Base Year. Commencing upon such Expense Recovery Period, Tenant shall pay the estimated amounts to Landlord in equal monthly installments, in advance, with Fixed Rent. If Landlord has not furnished its written estimate for any Expense Recovery Period by the time set forth above, Tenant shall continue to pay its share of Operating Costs and Landlord Taxes at the rates established for the prior Expense Recovery Period, if any; provided that when the new estimate is delivered to Tenant, Tenant shall, at the next monthly payment date, pay any accrued cost reimbursements based upon the new estimate. Landlord may from time to time change the Expense Recovery Period to reflect a calendar year or a new fiscal year of Landlord, as applicable, in which event Tenant's share of Operating Costs and Landlord Taxes shall be equitably prorated for any partial year.

6.4. *Actual Expenses and Adjustment.* Within one hundred twenty (120) days after the end of each Expense Recovery Period, Landlord shall furnish to Tenant a detailed statement setting forth the actual or prorated Operating Costs and Landlord Taxes attributable to that period, and the parties shall within thirty (30) days thereafter make any payment or allowance necessary to adjust Tenant's estimated payments, if any, to Tenant's actual proportionate shares as shown by the annual statement. If actual Landlord Taxes or Operating Costs allocable to Tenant during any Expense Recovery Period are less than the Landlord Taxes or the Operating Costs, respectively, Landlord shall not be required to pay that differential to Tenant, although Landlord shall refund any applicable estimated payments collected from Tenant. Should Tenant fail to object in writing to Landlord's determination of actual Operating Costs within sixty (60) days following delivery of Landlord's expense statement, Landlord's determination of actual Operating Costs for the applicable Expense Recovery Period shall be conclusive and binding on Tenant.

6.5. *Determination Upon Lease Termination.* Even though the Lease has terminated and the Tenant has vacated the Leased Premises, when the final determination is made of Tenant's Proportionate Share of Landlord Taxes and Operating Costs for the Expense Recovery Period in which the Lease terminates, Tenant shall upon notice pay the entire increase due over the estimated expenses paid; conversely, any overpayment made in the event expenses decrease shall be rebated by Landlord to Tenant. However, in lieu thereof, Landlord may deliver a reasonable estimate of the anticipated reconciliation amount to Tenant prior to the expiration of the Lease Term, in which event the appropriate party shall fund that amount by the termination date.

6.6. *Increase in Operating Costs.* If, at any time during any Expense Recovery Period, any one or more of the Operating Costs are increased to a rate(s) or amount(s) in excess of the rate(s) or amount(s) used in calculating the estimated expenses for the year, then Tenant's estimated share of Landlord Taxes or Operating Costs, as applicable, shall be increased for the month in which the increase becomes effective and for all succeeding months by an amount

RG

equal to Tenant's Proportionate Share of the increase. Landlord shall give Tenant written notice of the amount or estimated amount of the increase, the month in which the increase will become effective, Tenant's monthly share thereof and the months for which the payments are due. Tenant shall pay the increase to Landlord as a part of Tenant's monthly payments of estimated expenses, commencing with the month in which effective.

6.7. *Books of Account.* Landlord shall keep full and accurate books of account covering Landlord's Operating Costs and Landlord Taxes. Said books of account shall be retained by Landlord at Landlord's office in the Building or at such other place as Landlord may from time to time designate within the State of California, for a period of at least twelve (12) months after the expiration of each calendar year. Tenant shall have the right during the term of this Lease to inspect said books of account during normal business hours upon forty-eight (48) hours prior written notice.

## 7. SECURITY DEPOSIT.

7.1. *Amount and Purpose of Security Deposit.* Concurrently with the execution of this Lease, Tenant has delivered to Landlord a security deposit in the amount set forth in Section K of the Basic Lease provisions (herein called the "Deposit") as security for Tenant's faithful performance or observance, as the case may be, of each of the terms, covenants, conditions and provisions to be performed or observed by Tenant under this Lease. In the event that Tenant fails to pay Net Rent due hereunder, or otherwise fails to perform or observe any term, covenant, condition or provision to be performed or observed by Tenant under this Lease, Landlord may use, apply or retain all or any portion of the Deposit for the payment of Net Rent or any other sum to which Landlord may become entitled by reason of Tenant's failure, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses, applies or retains all or any portion of the Deposit, Tenant shall, within ten (10) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the Deposit to the amount set forth above.

7.2. *Return of Deposit.* Landlord shall not be required to keep the Deposit separate from its general accounts. If Tenant performs all of Tenant's obligations under the terms, covenants, conditions and provisions hereof, the Deposit, or so much thereof as has not theretofore been so used, applied or retained by Landlord, shall be returned, without payment of interest for its use, to Tenant, or, at Landlord's election, to the last assignee or sublessee, if any, of Tenant's interest hereunder, following the termination of his Lease; provided, however, that in no event shall Landlord be required to return the Deposit to Tenant prior to the date on which Tenant relinquishes possession of the Leased Premises.

## 8. PERSONAL PROPERTY TAXES.

8.1. *Tenant Taxes.* Tenant shall pay prior to delinquency all taxes, assessments, license fees and other charges (herein called "Tenant Taxes") that are levied and assessed against Tenant's personal property installed or located in or on the Leased Premises, including, without limitation, trade fixtures, furniture, counters, appliances, shelving, movable partitions and such other personal property of Tenant placed in or on the Leased Premises by Tenant (herein called "Tenant Property") or against Above-Standard Improvements and which accrue or become

10

payable during the term of this Lease.  On demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of such payments.

### 8.2. *Assessed as Part of Building.*

(a). In the event that any such Tenant Taxes are levied against Landlord or Landlord's property, or if Landlord Taxes, as hereinafter defined, are increased by virtue of the inclusion of a value placed on Tenant Property or said Above-Standard Improvements in the assessed value of the Building, Landlord shall have the right to pay such taxes regardless of the validity of the levy and Tenant shall reimburse Landlord for the amount of such taxes as additional Rent within ten (10) days after Landlord gives Tenant notice and demand for payment thereof.

(b). If the assessed value of the Building is increased by the inclusion of a value placed on Tenant Property or said Above-Standard Improvements, the proportion of said assessment attributable to Tenant Property or said Above-Standard Improvements (herein called "Proportion") shall be determined by reference to the work sheets of the Assessor of the County of Los Angeles, California (herein called "Work Sheets").  In the event that the Work Sheets should become unavailable for inspection by Landlord and Tenant, the Proportion for the remainder of the term of this Lease shall be the last Proportion determined by reference to the Work Sheets.

(c). If for any reason the Proportion cannot be determined in the manner provided for in Section 8.2(b) hereof, the Proportion shall be determined by an appraiser agreed to and paid for in equal shares by Landlord and Tenant.  The Proportion determined by said appraiser shall be final and shall be used throughout the term of this Lease; provided, however, that not more frequently than once every two (2) years, Tenant may at its sole cost, designate an appraiser, approved by Landlord, who shall determine the Proportion to be used thereafter.

(d). In the event that Tenant shall have the option to have Tenant Property and said Above-Standard Improvements assessed and taxed separately from the Building, Tenant shall exercise such option.

### 9. *UTILITIES AND SERVICES.*

9.1. *Elevator Service.*  Subject to causes beyond Landlord's reasonable control, Landlord shall provide automatic elevator service seven (7) days per week, twenty-four (24) hours per day.

9.2. *Heating, Ventilating and Air-Conditioning System.*  Daily, legal holidays excepted, between the hours of 8:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 1:00 p.m. Saturday (and at Tenant's request at other times for a reasonable additional charge to be fixed from time to time by Landlord), Landlord shall furnish heating or air-conditioning to the common areas of the Building when, in the reasonable judgment of Landlord, it may be required for the comfortable occupancy of the Leased Premises.  Tenant agrees to keep and cause to be kept closed all doors from the Leased Premises providing access to the common areas of the Building, and Tenant agrees to abide by all rules and regulations which Landlord may prescribe from time to time for the proper functioning and protection of the heating, ventilating and air-conditioning system.  Tenant shall not install or use in the Leased Premises any Equipment

11

(except duplicating or photocopying equipment and such equipment required for the Tenant's use) which would generate heat so as to adversely affect the heating, ventilating and air-conditioning system for the common areas of the Building. Landlord or Landlord's agents, throughout the term of this Lease, shall have free access to any and all mechanical installations of Landlord or Tenant, including, without limitation, air-conditioning, fan, ventilating, machine and telephone rooms and electrical closets. Tenant agrees that there shall be no construction of partitions or placement of other obstructions, including, without limitation, heavy equipment, furniture and file cabinets, which might interfere with the free access of Landlord or Landlord's agents to said mechanical installations. Tenant further agrees that neither Tenant nor its patients, customers, agents, servants, employees, contractors, suppliers, guests, visitors, licensees, invitees, sublessees or assignees (herein collectively called "Tenant's Representatives") shall at any time enter said enclosures or tamper with, adjust, touch, or otherwise in any manner affect said mechanical installations.

9.3. *Electricity.* Landlord shall provide Tenant's Leased Premises with separately metered electrical service (billable directly to Landlord which shall be reimbursed by the Tenant monthly as and when due – see addendum for more details) sufficient for the Tenant's usual lighting and office business machine purposes for its Use. Normal and usual lighting shall mean incandescent and fluorescent fixtures containing light bulbs which do not exceed 150 watts each, except if required in the ordinary course of Tenant's Use. Normal and usual office business machines shall include duplication or photocopying equipment or electronic data processing or ancillary equipment. Tenant shall not install, use or permit the installation or use of any Equipment designed to operate on electrical current in excess of 110 volts in, on or about the Leased Premises, without prior written notice to Landlord (other than the air conditioning system installed by Landlord for the Leased Premises) which shall not be unreasonably withheld or delayed. Tenant shall not connect any Equipment to the wires, conduits or pipes or other means by which electricity is conducted or supplied in a manner which would result in the use of additional or unusual amounts of electricity, without the prior written consent of Landlord. The cost of any electrical equipment, such as additional conduit, transformers or converters, required to satisfy electrical requirements for Tenant's equipment, shall be the sole responsibility of Tenant.

9.4. *Water.* Landlord shall furnish water the Tenant's Use and for drinking and lavatory purposes. Tenant shall not use water for any purpose other than for its Use and for ordinary drinking and lavatory purposes without the prior written consent of Landlord.

9.5. *Cleaning.* Landlord shall cause the Leased Premises to be maintained daily by a cleaning/janitorial service, so long as the Leased Premises are used exclusively for the purposes set forth in Section 4.1 hereof and are maintained in reasonable order by Tenant.

9.6. *Suspension of Services and Utilities.* Landlord may suspend cleaning services or service of the elevator, plumbing, heating, ventilating, air-conditioning and electric or other mechanical systems, when necessary by reason of accident, emergency, inspection, repairs, alterations or improvements. Landlord shall have no responsibility or liability for any consequential damages suffered by Tenant and/or Tenant's Representatives by reason of such suspension of services and such suspension shall not be deemed an actual or a constructive eviction. Landlord shall make commercially reasonable efforts to provide at least 24 hours

12

notice for all non-emergency work and utilize all reasonable efforts to minimize the duration of suspended building systems.

### 10. AUTOMOBILE PARKING.

10.1. *Parking Spaces.* Landlord hereby grants to Tenant the right to use automobile parking spaces (herein called "Parking Space" or "Parking Spaces") in common with other Tenants, upon the surface parking lot area pertaining to the Building. While there is currently no charge for such parking, Landlord expressly reserves the right to impose reasonable parking charges in the future. In addition, Tenant may contract separately for exclusive "reserved" parking spaces in the underground parking facility for use by Tenant. Landlord, at its sole election shall designate the types and locations of all Parking Spaces and Landlord shall have the right, at Landlord's sole election, to change said locations from time to time.

10.2. *Parking Rate.* Subject to Section 10.1, Tenant agrees to pay Landlord a monthly fee for each Parking Space utilized by Tenant and/or Tenant's employees, as Additional Rent, payable monthly in advance with payments of Fixed Rent. The amount of such monthly fee (the "Parking Rate" or "Parking Rates") for each type of Parking Space provided to Tenant shall be the prevailing Parking Rate, as Landlord may designate from time to time, at Landlord's sole election. In addition to the right reserved hereunder by Landlord to designate the Parking Rate from time to time, at Landlord's sole election, for each type of Parking Space and in addition to the proportionate share of any increases in Operating Costs to be paid by Tenant pursuant to Section 6 hereof, Landlord shall have the right to increase the Parking Rate at any time to include therein any amounts levied, assessed, imposed or required to be paid to any Governmental Authority on account of the parking of motor vehicles, including, without limitation, all sums required to be paid pursuant to transportation controls imposed by the Environmental Protection Agency under the Clean Air Act of 1970, or otherwise required to be paid pursuant to any other Law imposed by any Governmental Authority with respect to the parking, use, or transportation of motor vehicles, or the reduction or control of motor vehicle traffic, and/or motor vehicle pollution.

10.3. *Use by Designated Automobiles.* Tenant shall notify Landlord of the license plate number, year, make and model of the automobiles of the Tenant and its employees entitled to use the Parking Spaces. At Landlord's election, such automobiles shall be identified by automobile window stickers provided by Landlord, and only such designated automobiles shall be permitted to use the Parking Spaces.

10.4. *Additional Parking Space.* Landlord may provide additional parking spaces for use by Tenant or Tenant's Representatives on a daily basis at prevailing Parking Rates.

10.5. *Validation Stickers.* At Landlord's sole election, Landlord may make validation stickers available to Tenant for any additional parking spaces provided to Tenant pursuant to Section 10.4 hereof.

10.6. *Waiver of Landlord Responsibility.* The Parking Spaces and additional parking spaces provided for herein are provided solely for the accommodation of Tenant and Tenant expressly agrees that Landlord assumes no responsibility or liability of any kind whatsoever

13

from whatever cause with respect to the automobile parking areas, including, without limitation, adjoining streets, sidewalks, driveways, property and passageways, or the use thereof by Tenant or Tenant's Representatives.

## 11. ALTERATIONS, FIXTURES.

11.1. *Tenant Alterations; Mechanic's Liens.*     Tenant shall make no alterations, decorations, additions, or improvements in or to the Leased Premises, including placement of any sign visible from outside the Leased Premises, without the prior written consent of Landlord, and shall only employ therefore contractors or mechanics approved in advanced in writing by Landlord. All such work shall be done upon such conditions as Landlord may impose and at such times and in such manner as Landlord may from time to time designate. All work done by or for Tenant shall be performed in full compliance with the Laws of any Governmental Authority and in full compliance with the rules, orders, directions, regulations and requirements of any insurance company insuring the Building. Tenant shall give Landlord at least fifteen (15) days prior written notice of the proposed commencement of any work, and Landlord shall have the right to post appropriate notices of non-responsibility on or about the Building. Tenant shall secure, upon request by Landlord, at Tenant's sole cost, a lien and completion indemnity bond for the benefit of Landlord, in an amount satisfactory to Landlord, insuring the completion of said work. Any mechanic's or materialmen's lien filed against the Leased Premises and/or the Building for work claimed to have been done for, or materials claimed to have been furnished to, Tenant shall be discharged by Tenant, by bond or otherwise, within ten (10) days after the filing thereof, at Tenant's sole cost. Notwithstanding the foregoing the Tenant shall be permitted to finance its Trade Fixtures but shall not register any Notice of Security Interest or other charge in regard to such financing against title to the Project.

11.2. *Removal of Alterations.*     All alterations, decorations, additions, repairs or improvements upon the Leased Premises, made by either Landlord or Tenant, except Tenant Property, shall, unless Landlord elects otherwise, which election shall be made by giving notice to Tenant at least thirty (30) days prior to the termination of this Lease, become the property of Landlord, and shall remain upon, and be surrendered with, the Leased Premises, as part thereof, at the termination of this Lease. In the event that no Event of Default, as hereinafter defined, has occurred which has not been cured as provided in Section 19 hereof, Tenant shall have the right to remove all Tenant Property from the Leased Premises immediately prior to the termination of this Lease; provided, however, that Tenant shall repair, or, at Landlord's sole election, shall pay to Landlord, immediately upon presentment of a bill or bills therefore, the cost of repairing any damage arising from such removal. In the event of Tenant's failure to so remove all or any part of Tenant Property, Landlord may, at Landlord's sole election, retain all or any part of Tenant Property remaining on the Leased Premises immediately upon Tenant's abandonment of possession, and title thereto shall thereupon vest in Landlord and Landlord may remove from the Leased Premises, and dispose of in any manner, all or any part of said Tenant Property, in which event Tenant shall pay to Landlord, immediately upon presentment of a bill or bills therefore, any and all expenses of such removal and disposition, including, without limitation, expenses resulting from damage to the Leased Premises attributable to such removal. Notwithstanding the foregoing, Tenant shall not be required to remove constructed alterations such as walls, bathrooms, ceilings, built in cabinetry, flooring, carpet or non-medical plumbing. The Tenant

shall repair all damage caused by removal of medical equipment, cap any plumbing and repair the area around the pipes.

### 12. REPAIRS.

12.1. *Repairs by Tenant.*   Subject to the provisions of Section 16 hereof, Tenant shall maintain the Leased Premises in good order, condition and appearance and shall make such repairs as are necessary to preserve the Leased Premises in the same condition as on the Commencement Date or the date specified in the Occupancy Notice, ordinary wear and tear excepted.

12.2. *Repairs by Landlord.*   Landlord shall maintain the Building and the structural integrity of the Leased Premises in good order and repair, ordinary wear and tear excepted, subject to right to reimbursement as a common area operating expense pursuant to Section 6 hereof.

12.3. *Damage Caused by Tenant.*   Tenant shall be liable for all damage or injury to the Building and the structural integrity of the Leased Premises caused by the carelessness, negligence, or improper conduct of Tenant or Tenant's Representatives and for the full cost of repairing any such damage or injury to the extent that said cost is not fully reimbursed to Landlord under any insurance policy insuring the Building or the Leased Premises. Landlord may, at Landlord's sole election, repair or cause to be repaired said damage or injury and may collect from Tenant as Additional Rent immediately upon presentment of a bill or bills therefore any amounts expended by or on behalf of Landlord in excess of insurance proceeds received by Landlord.

12.4. *Waiver.*   Tenant hereby waives all rights under California law, as amended from time to time, and all rights under any Law in existence during the term of this Lease, authorizing a tenant to make repairs at the expense of a landlord, or to terminate a lease upon the complete or partial destruction of the leased premises.

### 13. INSURANCE.

13.1. *Tenant Insurance.*   Tenant, at Tenant's sole cost, shall obtain and maintain in effect throughout the term of this Lease:

(a). Commercial general liability insurance with respect to the Leased Premises and the operations of or on behalf of Tenant in, on or about the Leased Premises, including but not limited to coverage for personal injury, independent contractors, broad form property damage, fire legal liability, products liability (if a product is sold from the Premises), and liquor law liability (if alcoholic beverages are sold, served or consumed within the Premises), which policy(ies), written on an "occurrence" basis and for not less than $1,000,000 combined single limit (with a $50,000 minimum limit on fire legal liability) per occurrence for bodily injury, death, and property damage liability, or the current limit of liability carried by Tenant, whichever is greater, and subject to such increases in amounts as Landlord may determine from time to time;

15

RG

(b). Workers' compensation insurance coverage as required by law, together with employers' liability insurance coverage of at least $1,000,000;

(c). With respect to improvements, alterations, and the like required or permitted to be made by Tenant under this Lease, builder's risk insurance, in amounts satisfactory to Landlord;

(d). Insurance against fire, vandalism, malicious mischief and such other additional perils as may be included in a standard "special form" policy, insuring all Tenant Installations, trade fixtures, furnishings, equipment and items of personal property in the Premises, in an amount equal to not less than ninety percent (90%) of their actual replacement cost (with replacement cost endorsement), which policy shall also include loss of income/business interruption/extra expense coverage in an amount not less than nine months loss of income from Tenant's business in the Premises. In no event shall the limits of any policy be considered as limiting the liability of Tenant under this Lease.

13.2. *Landlord Insurance*. Subject to reimbursement pursuant to Section 6 hereof, Landlord shall maintain in effect on the Building a standard policy of fire and extended coverage insurance, with vandalism and malicious mischief endorsements. Such insurance shall contain a waiver of the insurer's right of subrogation against Tenant.

13.3. *Requirements of Tenant Insurance*. All insurance policies required of Tenant pursuant to Section 13.1 hereof shall (a) provide that such policies shall not be changed or canceled without at least thirty (30) days' prior written notice to Landlord, (b) name Landlord as an additional insured there under, and (c) provide that losses shall be adjusted with the insurers and/or underwriters by Landlord to the extent of Landlord's interest.

13.4. *Delivery of Policies or Certificates*. On or before the Commencement Date or the date specified in the Occupancy Notice and thereafter not less than thirty (30) days prior to the expiration dates of the insurance policies required of Tenant pursuant to Section 13.1 hereof, Tenant shall deliver to Landlord copies of said policies, or, in the case of liability insurance, certificates of the insurers, setting forth the satisfaction of the applicable requirements of Section 13.3 hereof, in form reasonably satisfactory to Landlord, accompanied by evidence satisfactory to Landlord of payment of the premiums due therefore.

13.5. *Increase in Tenant Insurance*. In the event that at any time of from time to time, Landlord's lender or Landlord's insurance broker shall determine that the amount of public liability and property damage insurance required of Tenant pursuant to Section 13.1 hereof is inadequate, Tenant shall increase the amount of such insurance as required by either Landlord's lender or Landlord's insurance broker.

14. *INDEMNITY.*

14.1. *General Indemnity*. Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all losses, costs, damages, charges, liabilities, obligations, fines, penalties, claims, demands, or judgments and any and all expenses, including, without limitation, attorneys' fees, arising out of or in connection with: (i) Tenant's use of the Leased Premises; (ii) the conduct of Tenant's business or any activity, work or thing done, permitted or suffered by Tenant

in, on or about the Leased Premises or the Building (iii) any failure to perform or observe any of the terms, covenants, conditions or provisions required to be performed or observed by Tenant under this Lease; (iv) any negligence (whether by act or omission) and any intentional act of Tenant or of Tenant's Representatives; or (v) any lien or claim of lien of the type described in Section 11.1 hereof, whether or not said lien is discharged pursuant to said Section; and in the event that any action or proceeding is brought against Landlord by reason of clauses (i) through (v) inclusive of this Section 14.1, Tenant, upon notice from Landlord, shall defend the same at Tenant's sole cost utilizing legal counsel acceptable to Landlord.

14.2. *Assumption of Risk.* Tenant hereby assumes all risk of damage to property (other than the Building) or injury to persons in or on the Leased Premises or arising from the use or occupation thereof from any cause whatsoever.

14.3. *Non liability of Landlord.* Tenant hereby agrees that Landlord shall have no liability for any injury to Tenant's professional practice and/or business or any loss of income there from or for damage to Tenant Property or to the equipment, goods, merchandise or other property of Tenant, Tenant's Representatives, or of any person in the Leased Premises, nor shall Landlord be liable for injury to the person of Tenant, Tenant's Representatives, or any other person, whether such damage or injury is caused by or results from theft, fire, steam, electricity, gas, water, precipitation, or from the breakage, leakage, obstruction or other defects in machinery, pipes, sprinklers, wires, appliances, plumbing, air conditioning, lighting fixtures, or other appurtenances connected with the Building or from any other cause whatsoever, whether said damage or injury results from conditions arising upon the Leased Premises or upon other portions of the Building or from other sources or places and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Tenant; except for any damage or injury caused by the gross negligence of Landlord. Landlord shall not be liable for any damages arising from any act or neglect of any other tenant of Landlord.

15. *LANDLORD'S RIGHTS.*

15.1. *Entrance for Inspection or Repair.* Landlord or Landlord's agents shall have the right to enter the Leased Premises at all reasonable times (provided, however, that in an emergency, Landlord or Landlord's agents may enter the Leased Premises at any time) to examine the same and to make such repairs alterations, decorations, additions or improvements as Landlord may deem necessary or desirable; provided, however, that Landlord or Landlord's agents shall make no alterations, decorations, additions or improvements which, when completed, would substantially alter the Leased Premises or substantially prevent Tenant from using the Leased Premises for the purposes set forth in Section 4 hereof. Landlord, or Landlord's agents, in making any such repairs, alterations, decorations, additions or improvements shall use its best efforts to avoid disrupting Tenant's use of the Leased Premises. Subject to the provisions of Section 16.7 hereof, there shall be no abatement of Net Rent in whole or in part by reason of loss or interruption of Tenant's business or otherwise resulting from the making of any such repairs, alterations, decorations, additions or improvements. Notwithstanding the foregoing the Landlord shall make best commercial efforts at all times not to disrupt the Tenant's business operation or block access to the Premises.

15.2. *Entrance for Business Purpose.* Landlord or Landlord's agents are hereby expressly granted permission to show the Leased Premises to prospective tenants during the last six (6) months of the lease and at all other times to mortgagees, purchasers, or lessees of the Building or to other persons with a business interest therein at all reasonable times.

15.3. *Entrance During Last Month of Lease Term.* In the event that during the last month of the term of this Lease Tenant shall have removed all or substantially all of Tenant Property from the Leased Premises, Landlord or Landlord's agents may immediately enter and alter, renovate and redecorate the Leased Premises, without abatement of Net Rent, in whole or in part, and such act shall have no effect whatsoever upon any of the terms, covenants, conditions or provisions of this Lease.

15.4. *Keys to Leased Premises.* Landlord shall provide Tenant with two (2) keys to the Leased Premises on the Commencement Date or the date specified in the Occupancy Notice and Tenant shall not change or tamper with any existing locks to bolts on the doors within the Leased Premises or providing access from the Leased Premises to the common areas of the Building nor shall Tenant place any additional locks, bolts or mail slots thereon. Landlord shall have the right to keep a key or keys for all locks on doors within the Leased Premises or providing access from the Leased Premises to the common areas of the Building and if Tenant shall not be present to open and permit an entry into the Leased Premises, or any portion thereof, Landlord or Landlord's agents may enter the same with such key or keys; provided, however, that during any such entry, Landlord or Landlord's agents shall accord reasonable care to Tenant Property. In the event that Tenant fails to observe the provisions of this Section 15.4, and that, as a result thereof, Landlord is unable to enter the Leased Premises or any portion thereof with the key or keys retained by Landlord, then, in addition to any other remedies now or hereafter allowed by Law of provided for herein, Landlord or Landlord's agents shall have the right to forcibly enter the Leased Premises or any portion thereof without liability therefore if such entry is necessary, at any time, and Tenant or Tenant's Representatives shall not be present to permit such entry. Tenant shall, upon termination of this Lease, restore to Landlord all keys to the Leased Premises (either furnished by Landlord or otherwise procured by Tenant). Tenant agrees to pay Landlord $50.00 for each lost key as a reasonable reimbursement cost to Landlord for keys lost by Tenant, as well as $25.00 per key for each additional key in excess of two (2) keys required by Tenant at the inception of this Lease.

15.5. *Change of Common Areas and Building Designation.* Landlord shall have the right to change the arrangement and location of entrances and passageways, doors and doorways, and corridors, elevators, stairs, toilets, and other public parts of the Building in a manner that does not unreasonably limit access to the Leased Premises or unreasonably disrupt the operation of the Tenants business. Upon reasonable notice to Tenant, Landlord shall have the right to change the name, and designation by which the Building is commonly known, without rendering Landlord liable for any damage suffered by Tenant thereby and without in any manner affecting the obligations of Tenant under the terms, covenants, conditions and provisions of this Lease.

*16. DAMAGE OR DESTRUCTION.*

16.1. *Partial Damage Covered by Insurance.* In the event that less than substantially all of the Leased Premises or the Building shall be damaged or destroyed by fire or any other

18

casualty included within the coverage of the insurance policy required of Landlord pursuant to
Section 13.2 hereof, Landlord shall, at Landlord's sole cost (subject to the right to reimbursement
for the deductible, if any, as part of the common area operating expenses), repair such damage or
destruction as soon as reasonably possible and this Lease shall continue in full force and effect.
Landlord shall not be liable for any reasonable delay which may arise as a result of causes
beyond Landlord's reasonable control, including, without limitation, any of the causes set forth in
Section 21.3 hereof.

16.2. *Partial Damage Not Covered by Insurance.* In the event that less than substantially
all of the Leased Premises or the Building shall be damaged or destroyed and such damage or
destruction shall (i) be caused by a casualty not included within the coverage of the insurance
policy required of Landlord pursuant to Section 13.2 hereof, or (ii) such casualty is included
within the coverage, however, the insurance proceeds are insufficient to complete any required
repairs, Landlord or Landlord's sole election, may either (x) repair such damage or destruction as
soon as reasonably possible at Landlord's sole cost, in which event this Lease shall continue in
full force and effect or (y) terminate this Lease as of the date of occurrence of such damage or
destruction by giving Tenant notice thereof within sixty (60) days after the date of occurrence of
such damage or destruction.

16.3. *Partial Damage During Last Six Months.* In the event that less than substantially
all of the Leased Premises of the Building shall be damaged or destroyed by any cause
whatsoever during the last nine (9) months of the term of this Lease, Landlord may elect not to
rebuild or restore the Leased Premises or the Building by giving Tenant written notice thereof
within sixty (60) days after the date of occurrence of such damage or destruction. In such event,
Landlord may retain all insurance proceeds and this Lease shall continue in full force and effect;
provided, however, that Tenant shall have the right to terminate this Lease by giving Landlord
notice thereof within fifteen (15) days after Landlord's notice to Tenant of Landlord's election
not to restore or rebuild the Leased Premises.

16.4. *Total or Substantial Damage.* In the event that the whole or substantially all of the
Leased Premises or the Building are damaged or destroyed by any cause whatsoever, Landlord,
at Landlord's sole election, may either (i) restore the Leased Premises to a condition comparable
to the condition of the Leased Premises or the Building immediately prior to such damage or
destruction as soon as reasonably possible at Landlord's sole cost, in which event this Lease shall
continue in full force and effect, or (ii) terminate this Lease as of the date of occurrence of such
damage or destruction by giving Tenant written notice thereof within sixty (60) days after the
date of occurrence of such damage or destruction, in which event Landlord may retain all
insurance proceeds.

16.5. *Insurance Payments Received By Tenant.* Notwithstanding anything to the contrary
contained herein, in the event that Landlord is required to or elects to repair the Leased Premises
pursuant to any provisions of this Section 16 and in the further event that Tenant shall receive
any insurance payments for loss of or damage to the Leased Premises under any of the insurance
policies required of Tenant pursuant to Section 13.1 hereof, Tenant shall pay over such insurance
payments to Landlord immediately upon receipt thereof; provided, however, that Tenant shall be
entitled to keep any insurance payments made to Tenant for loss of or damage to any Tenant
Property or for interruption of Tenant's business.

19

R 4

16.6. *Termination Following Delay.*  In the event that Landlord shall be obligated to repair or restore the Leased Premises or the Building under the provisions of this Section 16, and if Landlord shall not commence such repair or restoration within ninety (90) days after the date of occurrence of any damage or destruction and thereafter diligently prosecute the same to completion, Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof at any time prior to the commencement of such repair or restoration; provided, however, that if such delay is the result of causes beyond the Landlord's reasonable control, including, without limitation, any of the causes set forth in Section 21.3 hereof, Tenant shall not have the right to so terminate this Lease.  In the event that Landlord fails to complete any such repair or restoration within twelve (12) months after the date of occurrence of any damage or destruction, Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof at any time prior to the completion of such repair or restoration.

16.7. *Abatement of Net Rent.*  In the event that the Leased Premises or the Building shall be damaged or destroyed and Landlord repairs or restores the same pursuant to the provisions of this Section 16 or in the event that Tenant elects not to terminate this Lease pursuant to Section 16.3 hereof, Net Rent for the period during which such damage, destruction, repair or restoration continues shall be abated in proportion to the degree to which Tenant's use of the Leased Premises is impaired; provided, however, that if such damage is due to the fault or neglect of Tenant or Tenant's Representatives, there shall be no abatement of Net Rent and in such event, Tenant shall remove the debris, if any, at Tenant's sole cost.  Except for abatement of Net Rent, if any, Tenant shall have no claim against Landlord for damages, if any, suffered by reason of such damage, destruction, repair or restoration.

16.8. *Restoration of Tenant Property.*  In the event that the Leased Premises are damaged or destroyed and Landlord repairs or restores the same pursuant to this Section 16, Tenant shall be obligated to repair or restore the Tenant Property.

## EMINENT DOMAIN.

16.9. *Definitions.*

(a). "Taking" shall mean a taking by the exercise of the power of eminent domain or a sale under the threat of the exercise of such power.

(b). "Taking Date" shall mean the date on which Landlord is actually deprived of possession of all or part of the Building as a result of Taking.

16.10. *Total or Substantial Taking.*  In the event that there shall be a Taking of all or substantially all of the Building, this Lease shall terminate on the Taking Date.

16.11. *Partial Taking.*  In the event that there shall be a Taking of less than substantially all of the Building, Landlord at Landlord's sole election, shall have the right to terminate this Lease as of the Taking Date; provided, however, that if some portion of the Building is taken which does not include the Leased Premises or any portion thereof, Landlord shall only have the right to terminate this Lease if Landlord terminates the leases of all other tenants in the Building. In the event that such Taking materially and substantially interferes with the ability of Tenant to use the Leased Premises for the purpose set forth in Section 4 hereof, Tenant shall have the right

to terminate this Lease as of the Taking Date. Notice of termination shall be given by the terminating party to the other party within thirty (30) days after the Taking Date. In the event of such a termination, Landlord shall thereupon pay to Tenant any Fixed Rent theretofore paid by Tenant and unearned as of the Taking Date and Tenant shall pay to Landlord any Additional Rent accrued and unpaid as of the Taking Date. In the event that neither Landlord nor Tenant terminates this Lease pursuant to this Section 16.11, Net Rent shall be abated in proportion to the degree to which Tenant's use of the Leased Premises is impaired.

16.12. *Disposition of Award.* Any award or payment for a Taking shall be the property of Landlord, whether such award shall be made as compensation for diminution in the value of the leasehold, for the loss of goodwill, for the taking of the fee, for damages, or otherwise; provided, however, that Tenant shall be entitled to any award made to Tenant for loss of or damage to any Tenant Property, provided that such award to Tenant does not diminish any award that would otherwise be made to Landlord. In the event that neither Landlord nor Tenant terminates this Lease pursuant to Section 16.11 hereof, Landlord shall repair any damage to the Leased Premises caused by such Taking to the extent of clearly identifiable severance damages to the portion of the Leased Premises not so taken received by Landlord in connection with such a Taking.

16.13. *Non liability of Landlord.* In the event of a Taking, Tenant shall have no claim against Landlord for the value of the unexpired term of this Lease or otherwise.

*17. ASSIGNMENT AND SUBLETTING.*

17.1. *Written Consent Required.* Tenant shall not voluntarily or by operation of law assign, hypothecate, sublet, or otherwise transfer all or any part of Tenant's interest in this Lease or in the Leased Premises without the prior written consent of Landlord, which shall not be unreasonably withheld. In lieu of such consent, Landlord may, at Landlord's option, elect to terminate this Lease (or in case of a proposed subletting of a portion of the Premises, elect to terminate the Lease as respects that portion of the Premises being proposed for subletting) and the effective date of any such termination shall be thirty (30) days after the date of any notice to Landlord of any proposed assignment or subletting. Any attempted assignment, hypothecation, subletting or transfer without such consent shall be void and shall constitute an Event of Default hereunder. Notwithstanding anything in the Lease to the contrary, the Landlord shall have no right of Termination if the request for an Assignment is due to a sale of the Tenant's medical practice to a Landlord approved medical professional.

17.2. *Continuation of Tenant Obligations.* Regardless of Landlord's consent, no assignment, hypothecation, subletting or transfer shall release Tenant from its obligations under any of the terms, covenants, conditions, and provisions of this Lease. The acceptance by Landlord of Net Rent or other performance from Tenant or any other person or entity shall not be deemed to be a waiver by Landlord of this Section 17.

17.3. *Subsequent Assignments.* Consent of Landlord to one assignment, hypothecation, subletting or transfer shall not be deemed consent to any subsequent assignment, hypothecation, subletting or transfer.

17.4. *Costs of Consent.*   In the event that Landlord shall consent to an assignment, hypothecation, subletting or transfer under Section 17.1 hereof, Tenant shall pay Landlord as Additional Rent, upon presentment of a bill or bills thereof, the costs incurred by Landlord in connection with giving such consent, including, without limitation, reasonable attorneys' fees.

17.5. *Sharing of Increased Rent.*   Should any assignment or subletting occur, Tenant shall promptly pay or cause to be paid to Landlord, as additional rent, fifty percent (50%) of any amounts paid by the assignee or subtenant, however described and whether funded during or after the Lease Term, to the extent such amounts are in excess of the sum of (i) the scheduled rental sums payable by Tenant hereunder (or, in the event of a subletting of only a portion of the Leased Premises, the rent allocable to such portion, as reasonably determined by Landlord) and (ii) the direct out-of-pocket costs, as evidenced by third party invoices provided to Landlord, incurred by Tenant to effect the transfer, which costs shall be amortized over the remaining Term of this Lease or, if shorter, over the term of the sublease.  Upon request by Landlord, Tenant and all other parties to the transfer shall memorialize in writing the amounts to be paid pursuant to this section.

## 18. EVENTS OF DEFAULT; REMEDIES OF LANDLORD.

18.1. *Events of Default.*   The following shall constitute defaults of Tenant under this Lease:

(a). The failure by Tenant to pay the payment of the rent herein provided for or any other payment required to be made by Tenant hereunder, or any part thereof, as and when due, which failure continues after three (3) days written notice thereof; provided, however, that any such notice shall be in lieu of an not in addition to any notice required under California Code of Civil Procedure Section 1161 or any successor provision of California law.

(b). The failure by Tenant to perform any other of Tenant's agreements herein contained, which failure continues after ten (10) days written notice thereof; provided, however, that any such notice shall be in lieu of and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any successor provision of California law.

(c). The vacating or abandonment of the Leased Premises by Tenant, except for reasonable periods for vacation or due to illness.

(d). The making by Tenant or any guarantor of this Lease of any assignment for the benefit of creditors; the filing by or against Tenant or guarantor of a proceeding under the Federal or State Bankruptcy Acts (including arrangement or reorganization proceedings); the appointment of a receiver, trustee or custodian to take possession of Tenant's assets; the attachment or seizure by execution of Tenant's assets in the Leased Premises or the placement of a keeper therein, provided in case of petition or action filed against Tenant or guarantor, Tenant or guarantor shall have thirty (30) days in which to secure the dismissal or abandonment thereof.

(e). The failure by Tenant to comply with the terms of any other lease made by Tenant for space in the Building, if such failure constitutes a default under such other lease.

(f). If Tenant is a corporation, partnership, limited liability company or other form of entity, Tenant ceasing to remain in good standing in its state of incorporation and in the State of California, if different.

(g). If Tenant is a partnership, the dissolution or liquidation of Tenant.

(h). The failure by Tenant to provide accurate financial data to Landlord, either as a material inducement to persuade Landlord to enter into this Lease or during the Term of this Lease, concerning Tenant's economic stability or earning capacity of Tenant. Such an act shall be considered an incurable default by Tenant and the provisions of Section 19.2 shall immediately apply.

18.2. *Landlord's Remedies.* In the event of any default of Tenant as defined is Section 18.1 hereof, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default (including, but without limitation, indemnification for liability for personal injuries or property damage arising prior to the termination of the lease):

(a). Terminate this Lease and Tenant's right to possession of the Leased Premises and re-enter and retake possession of the Leased Premises. Upon any such entry by Landlord, this Lease shall terminate and Tenant shall immediately surrender possession of the Leased Premises to Landlord. In the event that Tenant fails to so surrender Leased Premises, Landlord may expel, remove or put out Tenant and all those claiming through or under Tenant, together with all personal property found therein by any lawful means (including forcible expulsion if necessary), without being deemed guilty of any manner of trespass and without prejudice to any other rights Landlord might have. Acts of maintenance, efforts to relet the Leased Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession.

(b). If Landlord elects to terminate this Lease as provided in Section 18.2(a) above, Landlord shall be entitled to recover from Tenant the aggregate of: (i) The worth at the time of award of the unpaid rent and charges equivalent to rent earned as of the date of termination hereof; (ii) The worth at the time of award of the amount by which the unpaid rent and charges equivalent to rent which would have been earned after the date of termination hereof until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (iii) The worth at the time of award of the amount by which the unpaid rent and charges equivalent to rent for the balance of the Lease Term hereof after the term of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided. Additionally, upon any such termination, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including, without limitation, all costs incurred in entering, retaking, recovering possession and reletting the Leased Premises (including the costs of repairing, altering, renovating, redecorating, remodeling and/or changing the character of the Leased Premises, advertisements, brokerage commissions, rent collections, attorney's fees, costs of litigation and the like) and any other amounts hereafter permitted by law, in order to compensate Landlord for all detriment caused by Tenant's failure to perform its obligations under this Lease; (iv) the term "worth" shall be deemed to include interest in all cases. Notwithstanding anything to the contrary contained in any laws, with respect to any

23

damages that are certain or ascertainable by calculation, interest shall accrue from the day that the right to the damages vests in Landlord, and in the case of any unliquidated claim, interest shall accrue from the day of claim arose.

18.3. *Definitions.* For the purposes of this Section, the term "time of award" shall mean the date upon which the judgment in any action brought by Landlord against Tenant by reason of such default is entered or such earlier date as the court may determine; the "worth of time of award" of the amounts referred to in Subsections 18.2(b)(i) and 18.2(b)(ii) hereof shall be computed by allowing interest at the rate of three percent (3%) per annum plus the Federal Reserve discount rate described below and the "worth at the time of award" of the amount referred to in 18.2(b)(iii) hereof shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). Tenant agrees that such charges shall be recoverable by Landlord in any unlawful detainer or similar proceeding shall be included in the "damages" provided in California Code of Civil Procedure Section 1174(b) or any similar, successor or related provisions of law. Further, Tenant hereby waives the provisions of California Code of Civil Procedure Section 1174 (c) providing for Tenant's right to satisfy any judgment in lieu of a forfeiture of the Lease. For purposes of determining the amount of the unpaid rent in subsection above, the unpaid rent shall include all amounts payable by Tenant to Landlord hereunder, including without limitation, the amounts set forth in Sections 5 and 6 herein.

18.4. *Increase in Additional Rent.* For purposes of determining the amount of unpaid rent for the balance of the Term of the Lease after the termination of the Lease, all costs or expenses contemplated by Sections 5 and 6 shall be deemed to increase annually for the balance of the Term by an amount equal to the average annual increase in such costs paid by Landlord during the three (3) calendar years preceding the year in which the Lease was terminated or if the building is less than three (3) years old, the average annual increase during such shorter period. Tenant shall be deemed to have agreed to pay its share of such specific amounts.

18.5. *Tenant's Abandonment.* In the event that Tenant shall have abandoned the Leased Premises, Landlord shall have the option of:

(a). Retaking possession of the Leased Premises and recovering from Tenant the amount specified in Paragraph 18.2(b); or

(b). Maintain Tenant's right of possession, in which case this Lease shall continue in effect, whether or not Tenant shall have the abandoned the Leased Premises. Landlord shall have the right to collect Rent when due. During the period Tenant is in default, Landlord can enter the Leased Premises and relet the Leased Premises, or any part thereof, to third parties for Tenant's account. Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Leased Premises, including, without limitation, broker's commissions, expenses of the remodeling the Leased Premises required by the reletting, and like costs. Reletting can be for a period shorter or longer than the remaining Term of the Lease. Tenant shall pay to Landlord the Rent due under this Lease on the date the Rent is due, less the Rent Landlord receives from any reletting. No act by Landlord allowed by this Section or elsewhere in this Lease shall terminate this Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate this Lease.

24

RG

18.6. *Other Remedies.* Landlord, in the event of a default by Tenant, may, in addition to the foregoing, pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the Sate of California.

18.7. *Tenant's Waiver of Redemption Rights.* Tenant waives any and all rights of redemption granted by or under any laws if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Leased Premises by reason of the violation by Tenant of any of the terms, covenants or conditions of this Lease, or otherwise.

18.8. *Tenant's Property.* In the event of any default by Tenant, Landlord shall have the right, but not the obligation, in addition to any other remedies or elections the Landlord may have, to remove from the Leased Premises all personal property located therein and may place the same in storage at a public warehouse for the account of and at the expense and risk of Tenant and Tenant hereby irrevocably appoints Landlord the agent and attorney-in-fact of Tenant for such purposes. The cost of removal and storage shall be deemed additional rent hereunder. Landlord need not pay any such storage charges, however, and Tenant agrees that such warehouse may dispose of said goods without notice to Tenant, and Tenant hereby waives any claims against Landlord by reason of such removal and/or disposition of such goods.

18.9. *Injunctive Relief.* In the event of any failure to perform or observe, or any threatened failure to perform or observe, any of the terms, covenants, conditions or provisions to be performed or observed by Tenant under this Lease, Landlord shall be entitled to enjoin such failure or threatened failure and shall have the right to invoke any right or remedy allowed at law or in equity or by Law or otherwise; provided, however, that this Lease shall be terminated only in the manner set forth in Section 19.2(a) hereof.

18.10. *Waivers.* Tenant hereby waives and relinquishes unto and in favor of Landlord the operation of all Laws which do now, or hereafter may, exempt any Tenant Property except for patient records and charts however stored, any property in the care or custody of Tenant or any property in any way belonging to Tenant, whether on the Leased Premises or elsewhere, from levy and sale upon distress for Net Rent or upon execution of any judgment obtained in an action brought for nonpayment of Net Rent or for failure to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Tenant under this Lease. The parties hereto shall and do hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter whatsoever arising out of or in any way connected with this Lease or Tenant's use or occupancy of the Leased Premises or arising out of or any way connected with any claim of injury or damage arising out of or in connection with this Lease or such use or occupancy. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Law in the event of Tenant being evicted or dispossessed from the Leased Premises for any cause or in the event of Landlord obtaining possession of the Leased Premises by reason of the occurrence of an Event of Default or otherwise.

18.11. *Arbitration.* Notwithstanding anything to the contrary contained herein, the provisions of this Section 18 shall not be subject to arbitration pursuant to Section 24.2 hereof.

25

19. *SECURITY INTEREST.*  Pursuant to the provisions of the Uniform Commercial Code of California as from time to time amended, Tenant hereby grants to Landlord a security interest in Tenant Property to secure payment of Net Rent.

## 20. *DEFAULTS BY LANDLORD; EXCUSE OF PERFORMANCE.*

20.1. *Defaults by Landlord.*  Should Landlord at any time fail to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Landlord under this Lease, Tenant shall not have the right to exercise any of its rights or remedies in connection therewith, if any, unless Landlord fails to cure said failure within thirty (30) days after written notice thereof from Tenant or, in the case of failure which is susceptible of being cured but cannot with due diligence be cured within such thirty (30) day period to cure the same and thereafter to prosecute such curing with all due diligence to completion. Any notice from Tenant to Landlord provided for in this Section 20 shall specify the particulars of any such failure.

20.2. *Limitation of Landlord Liability.*  In the event that Landlord shall become obligated to pay Tenant a money judgment arising out of any failure by Landlord to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Landlord hereunder, Tenant shall be limited for the satisfaction of said money judgment solely to landlord's interest in the Building or any proceeds arising from the sale thereof and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure whatsoever for the satisfaction of said money judgment.

20.3. *Force Majeure.*  Any failure by Landlord to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Landlord under this Lease shall be excused if such failure is the result of any cause beyond Landlord reasonable control, including, without limitation, the holding over of any tenant or tenants, the act of any third party not under the control of Landlord or Tenant, the adjustment of fire insurance on the part of Landlord, strike or labor troubles, fuel shortages, governmental preemption or curtailment in connection with a national emergency or in connection with any Law of any Governmental Authority or by reason of the unavailability of materials, and subject to the provisions of Section 3.2 and Section 16.6 hereof, the obligation of Tenant to pay Net Rent hereunder and to perform or observe all of the other terms, covenants, conditions or provisions to be performed or observed by Tenant under this Lease shall in no way be affected, impaired, or excused by reason of any such failure which is so excused.

21. *SALE OR TRANSFER OF BUILDING.*  Upon the consummation of a sale or transfer of the Building, Landlord shall be released from any liability thereafter accruing under this Lease. Landlord may transfer the Deposit to Landlord's successor in interest, and upon such transfer, Landlord shall be discharged from any further liability with respect to the Deposit.

22. *SURRENDER OF LEASED PREMISES.*  Subject to the provisions of Section 12 hereof, upon termination of this Lease, Tenant shall surrender to Landlord the Leased Premises and all improvements, alterations, decoration and additions thereto in the same condition as on the Commencement Date or on the date specified in the Occupancy Notice, reasonable and tear excepted. If Tenant fails to surrender the Leased Premises, Tenant shall hold Landlord harmless

26

from all damages resulting from such failure, including, without limitation, claims made by a succeeding tenant or tenants resulting from such Tenant failure.

23. *HOLDING OVER.*  Tenant shall have no right to hold over beyond the expiration or earlier termination of the term of this Lease.  In the event that Tenant, with Landlord's prior written consent, remains in possession of the Leased Premises after the expiration or earlier termination of this Lease, such possession by Tenant shall be deemed to be a month-to-month tenancy terminable upon thirty (30) days' written notice given at any time by either party.  Such month-to-month tenancy shall be upon all the terms, covenants, conditions and provisions of this Lease except those pertaining to term, option to extend, if any, and the amount of Net Rent.  During such month-to-month tenancy, Tenant shall pay as Net rent, payable in advance on the first day of each month, an amount equal to one hundred fifty percent (150%) of the amount due and payable by Tenant as Net Rent for the last month of the term of this Lease.

24. *WAIVER OF JURY TRIAL/RIGHT TO ARBITRATE.*

24.1. *Waiver of Jury Trial.*  LANDLORD AND TENANT EACH ACKNOWLEDGES THAT IT IS AWARE OF AND HAS HAD THE ADVICE OF COUNSEL OF ITS CHOICE WITH RESPECT TO ITS RIGHT TO TRIAL BY JURY, AND EACH PARTY DOES HEREBY EXPRESSLY AND KNOWINGLY WAIVE AND RELEASE ALL SUCH RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER (AND/OR AGAINST ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.

24.2. *Arbitration.*  SHOULD A DISPUTE ARISE BETWEEN THE PARTIES REGARDING ANY MATTER DESCRIBED ABOVE, THEN EXCEPT WITH RESPECT TO ACTIONS FOR UNLAWFUL OR FORCIBLE DETAINER EITHER PARTY MAY CAUSE THE DISPUTE TO BE SUBMITTED TO EITHER JAMS/ENDISPUTE ("JAMS") OR THE AMERICAN ARBITRATION ASSOCIATION ("AAA"), OR THEIR SUCCESSORS, IN THE COUNTY IN WHICH THE BUILDING IS SITUATED FOR BINDING ARBITRATION BEFORE A SINGLE ARBITRATOR. HOWEVER, EACH PARTY RESERVES THE RIGHT TO SEEK A PROVISIONAL REMEDY BY JUDICIAL ACTION.  NO ARBITRATION ELECTION BY EITHER PARTY PURSUANT TO THIS SUBSECTION SHALL BE EFFECTIVE IF MADE LATER THAN THIRTY (30) DAYS FOLLOWING SERVICE OF A JUDICIAL SUMMONS AND COMPLAINT BY OR UPON SUCH PARTY CONCERNING THE DISPUTE. THE ARBITRATION ELECTION SHALL DESIGNATE WHETHER THE ARBITRATION WILL BE CONDUCTED WITH JAMS OR AAA.  THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES OF PRACTICE AND PROCEDURE OF JAMS OR THE COMMERCIAL ARBITRATION RULES OF THE AAA, AS APPLICABLE, AND OTHERWISE PURSUANT TO THE CALIFORNIA ARBITRATION ACT (CODE OF CIVIL PROCEDURE SECTIONS 1280 ET SEQ.).  NOTWITHSTANDING THE FOREGOING, THE ARBITRATOR IS SPECIFICALLY DIRECTED TO LIMIT DISCOVERY TO THAT WHICH IS ESSENTIAL TO THE EFFECTIVE PROSECUTION OR DEFENSE OF THE ACTION, AND IN NO EVENT SHALL SUCH DISCOVERY BY EITHER PARTY INCLUDE MORE THAN ONE NON-EXPERT WITNESS DEPOSITION UNLESS BOTH PARTIES OTHERWISE AGREE.  THE ARBITRATOR SHALL, TO THE EXTENT APPLICABLE, FOLLOW THE SUBSTANTIVE LAW OF CALIFORNIA AND SHALL RENDER A REASONED WRITTEN DECISION WITHIN TWENTY DAYS FOLLOWING THE HEARING. THE ARBITRATOR SHALL APPORTION THE COSTS OF THE ARBITRATION, TOGETHER WITH THE ATTORNEYS' FEES

OF THE PARTIES, IN THE MANNER DEEMED EQUITABLE BY THE ARBITRATOR, IT BEING THE INTENTION OF THE PARTIES THAT THE PREVAILING PARTY ORDINARILY BE ENTITLED TO RECOVER ITS REASONABLE COSTS AND FEES.  JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY ANY COURT HAVING JURISDICTION.

25. *ADDITIONAL CHARGE.*  Tenant's failure to pay Net Rent or any portion thereof when due and payable hereunder may cause Landlord to incur unanticipated costs, the exact amount of which are impractical or extremely difficult to ascertain.  Such costs may include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by any ground lease, mortgage or trust deed encumbering the Building.  Therefore, if Landlord does not receive any rent payment within five (5) days after it becomes due, Tenant shall pay to Landlord, on demand, as Additional Rent, a late charge equal to ten percent (10%) of the delinquent payment as a fair and reasonable estimate of the costs Landlord will incur during the first month by reason of such late payment.  After the first month, such delinquent payments shall bear interest at the highest rate allowable under applicable law.  In the event Tenant fails to promptly pay Net Rent more than three (3) times in any one calendar year, the late charge shall be increased by an additional ten percent (10%) of the over due amount for any additional overdue payments occurring during such calendar year, and Landlord may thereafter require the payment of Net Rent quarterly in advance.

26. *BROKERS' COMMISSIONS.*  The parties recognize as the broker(s) who negotiated this Lease the firm(s), if any, whose name(s) is (are) stated in Item Q of the Basic Lease Provisions, and agree that Landlord shall be responsible for the payment of brokerage commissions to those broker(s), unless otherwise provided in this Lease.  Each party warrants that it has had no dealings with any other real estate broker or agent in connection with the negotiation of this Lease, and agrees to indemnify and hold the other party harmless from any cost, expense or liability (including reasonable attorneys' fees) for any compensation, commissions or charges claimed by any other real estate broker or agent employed or claiming to represent or to have been employed by the indemnifying party in connection with the negotiation of this Lease.  The foregoing agreement shall survive the termination of this Lease.

27. *SUBORDINATION.*

27.1. *Subordination to Encumbrances.*  This Lease is and shall be subordinate to any encumbrance now of record or recorded after the date of this Lease affecting the Building and to all renewals, modifications, consolidations, replacements or extensions of such encumbrances (the "Lien").

27.2. *Execution of Subordination Documents.*  Such subordination shall be effective without any further act of Tenant.  Notwithstanding the foregoing, Tenant shall, from time to time, on request from Landlord or the Landlord's lender, execute and deliver any documents or instruments that may be required by any lender to effectuate any subordination provided none of Tenant's right's hereunder are diminished.  Tenant hereby irrevocably constitutes and appoints Landlord as Tenant's special attorney-in-fact to execute and deliver any such documents or instruments in the event that Tenant shall fail to execute and deliver any such documents or instruments.

28

27.3. *Foreclosure of Encumbrance.* In the event of foreclosure or exercise of a power of sale under any encumbrance now or hereafter affecting the Building, the beneficiary under any such encumbrance (or purchaser at any sale pursuant thereto) shall have the option (i) to require Tenant to attorn to such beneficiary or purchaser or to enter into a new lease with such beneficiary or purchaser (as Landlord) for the balance of the term then remaining hereunder upon the same terms, covenants, conditions and provisions as those provided for herein; or (ii) notwithstanding this Section 27, to elect that this Lease shall become superior to such encumbrance. Tenant shall agree that any purchaser at a foreclosure sale or lender taking title under a deed in lieu of foreclosure shall not be responsible for any act or omission of a prior landlord, shall not be subject to any offsets or defenses Tenant may have against a prior landlord, and shall not be liable for the return of any security deposit not actually recovered by such purchaser or bound by any rent paid in advance of the calendar month in which the transfer of title occurred; provided that the foregoing shall not release the applicable prior landlord from any liability for those obligations. Tenant acknowledges that Landlord's mortgagees and successors-in-interest and all beneficiaries under deeds of trust encumbering the Building are intended third party beneficiaries of this Section.

27.4. *Right to Declare Subordinate Lien.* Notwithstanding the foregoing, upon written notice, a lender holding a Lien against the Building shall have the absolute right to declare and cause this Lease to be prior to any Lien held by or for the benefit of such lender.

28. *ESTOPPEL CERTIFICATE.*

28.1. *Tenant Duty to Deliver Certificate.* Tenant shall, at any time, upon not less than ten (10) business days prior written notice from Landlord, execute, acknowledge and deliver to Landlord, in a form requested by Landlord, a written statement (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which Fixed Rent and Additional Rent are paid in advance, if any, (ii) acknowledging that there is not, to Tenant's knowledge, any uncured failure on the part of Landlord to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Landlord hereunder, or specifying any such failure, if any is claimed; and (iii) setting forth all further information that Landlord may reasonably require. Tenant's statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Building.

28.2. *Consequences of Failure to Deliver Certificate.* In addition to Landlord's other rights and remedies, Tenant's failure to deliver such statement within such ten day period from request by Landlord or Lender shall be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord; (ii) that there are no such uncured failures; and (iii) that not more than one (1) month's Fixed Rent has been paid in advance.

28.3. *Tenant Duty to Deliver Financial Information.* In the event that Landlord desires to finance or refinance the Building, Tenant hereby agrees to deliver to any lender designated by Landlord such financial information about Tenant as may be reasonably required by such lender. Such information shall include a balance sheet and a profit and loss statement as at the end of and for each of the last three full fiscal years of Tenant. All such statements shall be prepared by

R W

a certified public accountant and certified to be true and correct by Tenant or, if Tenant is not a natural person, by an officer, director, or general partner of Tenant.  All such financial information shall be received by Landlord in confidence and shall be used only for the purposes set forth herein.

### 29. RULES AND REGULATIONS.

29.1. *Compliance.*  Tenant and Tenant's Representatives shall observe faithfully and comply strictly with the Rules and Regulations attached hereto as Exhibit "D" and incorporated herein by reference, and with such other and further reasonable rules and regulations as Landlord or Landlord's agents may from time to time adopt.  Notice of any additional rules or regulations shall be given in such manner as Landlord may elect.

29.2. *Non liability of Landlord for Violations.*  Landlord shall not be liable to Tenant for the violation of any of said Rules and Regulations, or the failure of any other tenant in the Building to perform or observe any of the terms, covenants, conditions, or provisions to be performed or observed by any such tenant under any lease between such tenant and Landlord.

30. *WAIVER*  No failure to exercise or delay in exercising any right or remedy of Landlord upon the occurrence of any Event of Default shall impair such right or remedy or be construed as a waiver thereof.  The receipt and acceptance by Landlord of delinquent Net Rent shall only constitute a waiver of timely payment for the particular Net Rent payment accepted and shall not constitute a waiver of any other Event of Default.  No act or conduct of Landlord, including, without limitations, the acceptance of the keys to the Leased Premises from Tenant, shall constitute an acceptance of the surrender of the Leased Premises by Tenant before the termination of this Lease.  Only a notice from Landlord to Tenant shall constitute acceptance of the surrender of the Leased Premises and accomplish the termination of this Lease.  Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant.  Any waiver by Landlord of any Event of Default must be in writing and shall not be a waiver of any other Event of Default whatsoever.

31. *NO RECORDATION.*  Neither this Lease nor a memorandum of same shall be recorded.

32. *TIME OF ESSENCE.*  Time is of the essence of each provision of this Lease.

33. *SUCCESSORS AND ASSIGNS.*  This Lease shall be binding on and inure to the benefit of the parties, and their successors in interest and assigns.

### 34. MULTIPLE TENANTS.

34.1. *Joint and Several Liability.*  In the event that more than on person or entity executes this Lease as Tenant, each such person or entity shall be jointly and severally liable for observing and performing each of the terms, covenants, conditions and provisions to be observed or performed by Tenant under this Lease.

34.2. *Notice.*  In the event that more than one person or entity executes this Lease as Tenant, the term "Tenant" as used in this Lease shall mean and include each such person or

entity jointly and severally and the act of or notice from, or notice or refund to, or the signature of, any one or more of such persons or entities, with respect to any term, covenant, condition or provision of this Lease shall be binding upon each and all of said persons or entities with the same force and effect as if each and all of said persons or entities had so acted or so given or received such notice or refund or so signed.

35. *SEVERABILITY.* The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect or impair the validity of any other provision hereof.

36. *INTEGRATED AGREEMENT; MODIFICATION.* This Lease contains all agreements of the parties with respect to the subject matter hereof. No prior agreement or understanding pertaining to such matter shall be effective. This Lease cannot be amended or modified except by a written agreement executed by each of the parties hereto.

37. *COVENANTS AND CONDITIONS.* Each covenant, condition, or provision to be performed or observed by Tenant under this Lease shall be deemed to be both a covenant and a condition.

38. *ORGANIZATION AND QUALIFICATION; CORPORATE AUTHORITY.*

38.1. *Warranty of Organization and Qualification.* In the event that Tenant, or any of the entities comprising Tenant, is a corporation, limited liability company or a partnership, Tenant represents and warrants that such corporation, limited liability company or partnership is duly organized and validly existing under the Laws of the State of its incorporation or formation and, if a corporation, is in good standing under said Laws, and is duly qualified to do business in the State of California.

38.2. *Warranty of Authority.* In the event that Tenant, or any of the entities comprising Tenant, is a corporation, limited liability company or a partnership, each individual executing this lease on behalf of said corporation, limited liability company or partnership represents and warrants that such individual is duly authorized to execute and deliver this Lease on behalf of said corporation, limited liability company or partnership and Tenant shall, prior to or concurrently with the execution of this lease, deliver to Landlord any documents or opinions of Tenant's counsel as may be reasonably requested by Landlord, establishing or confirming the power and authority of such individual to execute and deliver the Lease, and to obligate Tenant to perform and observe Tenant's obligations under this Lease in accordance with the terms, covenants, conditions, and provisions thereof.

39. *EXHIBITS AND ADDENDA.* All exhibits and addenda attached hereto and reference herein are hereby incorporated in this lease and are to be construed as part of this Lease and the terms and phrases used therein shall have the same meaning as provided for herein.

40. *SURVIVAL OF PROVISIONS.* All provisions of this Lease pertaining to the performance or observance of any obligation to be performed or observed after the termination of this Lease shall survive such termination.

R G

41. *ATTORNEYS FEES.* In the event that any suit in law or inequity, arbitration or other formal proceeding is instituted by either party to enforce or interpret any part of this Lease, or to recover damages for breach thereof, the prevailing party shall be entitled to recover cost of suit incurred therein, and also to recover as an element of such cost or as damages, only if not allowed as costs, actual attorney's fees as approved by the presiding tribunal. For the purposes of this section, the term "prevailing party" shall be the party who is entitled to recover costs of suit, whether or not the proceeding is brought to final judgment or award, or, if brought to judgment, who has recovered judgment in excess of the amount, if any, offered in compromise by the other party pursuant to the provisions of California Civil Code of Procedure Section 998. A party not entitled to recover costs shall not recover attorney's fees. No sum of attorney's fees shall be included in any computation of the amount of judgment or award for purposes of determining whether a party is entitled to recover costs or attorney's fees.

42. *INTERPRETATION OF LEASE.* This Lease shall be construed and interpreted in accordance with the Laws of the State of California. The language in all parts of this Lease shall be construed according to its normal and usual meaning and not strictly for or against either Landlord or Tenant.

43. *SINGULAR OR PLURAL.* When required by the context of this Lease, the singular shall include the plural.

44. *CAPTIONS.* Captions used herein shall have no effect on the interpretation of this Lease.

45. *NOTICES.* Any communication or notice a party may be required or may desire to give hereunder shall be in writing and delivered by personal service, registered or certified mail, postage prepaid, return receipt requested, overnight mail, addressed in the manner described in Item N of the Basic Lease Provisions or by facsimile transmission to the fax number set forth in such Item. Any party may change its address for notice by written notice given to the other in the manner provided in this Section. Any such communication or notice shall be deemed to have been duly given or served on the date personally served, on the date shown on the return receipt or other evidence of delivery, if mailed, on the date placed with the overnight mail carrier, if sent by overnight mail, and on the date sent by fax, provided that such transmission shall produce and the sender shall retain a mechanically generated receipt.

46. *LEGAL RELATIONSHIP.* Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Landlord and Tenant.

47. *GUARANTY OF LEASE.* (This Section 47 shall only apply if there is a guarantor specified in Item P of the Basic Lease provisions (the "Guarantor").

47.1. *Execution.* The Guarantor, if any, shall each execute a guaranty in a form reasonably satisfactory to the Landlord. Each such Guarantor shall have the same obligations as Tenant under this Lease.

47.2. *Default.* It shall constitute a default of the Tenant if any Guarantor fails or refuses, upon request to provide:

(a). evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty,

(b). current financial statements,

(c). an estoppel certificate, or

(d). written confirmation that the guaranty is still in effect.

48. *ADDITIONAL PROVISIONS.* Each of the provisions contained in the Addendum which is attached hereto as Exhibit D, if any, is incorporated herein by this reference with the same force and effect as if stated herein verbatim.

49. *OPTION TO RENEW TERM.* Provided that Tenant is not in default (i) at the time Tenant gives notice of its intention to extend the Term of the Lease, and (ii) at the time that the Option Term is to begin, Tenant shall have the right and option to extend the Term of this Lease for the additional term shown in Item G of the Basic Lease Provisions (the "Option Term"). Such Option Term shall be based on the same terms and conditions contained in this Lease. Tenant shall exercise its option to extend the term of the Lease by giving written notice to the Landlord in the manner provided in the Lease for giving of notices.

50. *LENDER'S PRIOR APPROVAL.* N/A

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the day and year first above written.

"LANDLORD"

**MANOR PARK, LLC**

By: _David Azouz_    2/22/12

David Azouz, Manorhouse Properties 1, LLC
Managing Member

"TENANT"

**G&K Foundation, a non-profit Public Benefit Corporation, DBA CareFirst RX**

By: _____
Robert Gevorkian

Title: _C E O_ _____

Date: _2 - 20 - 12_ _____

33

**EXHIBIT "A"**

**THE LEASED PREMISES**



## EXHIBIT "B"

## LANDLORD'S WORK

### RECITALS

See Exhibit "D" Addendum for more details

1. Demo and haul walls and floor covering
2. Frame new wall and doorways, openings in front office walls per plan
3. Demo electrical in walls to be removed. Provide electrical in new walls per code
4. Install one new 3' exterior fire rated door to common hallway per plan.
5. Install one 3' interior doors to match existing per plan.
6. Drywall, tape and mud as necessary
7. Prime and paint entire suite one color
8. Install new commercial grade VCT throughout and cove base to match
9. Fabricate and install one (1) new counter top (laminate)
10. T-Bar ceiling repair as necessary for demolished walls

*R G*

## EXHIBIT "C"

## RULES AND REGULATIONS ATTACHED TO
## AND MADE A PART OF THIS LEASE

1. No sign, placard, picture, advertisement, name or notice shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the Building, except as approved by Landlord in writing.

2. All approved signs or lettering on doors shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord.

3. Tenant shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall which may appear unsightly from outside the Premises; provided, however, that Landlord shall furnish and install a Building Standard window covering at all exterior windows.

4. The bulletin board or Building's central directory will be provided exclusively for the display of the names and locations of Tenants. Landlord reserves the right to exclude any other names therefrom. Tenant shall be entitled to a double line entry, space permitting on the central directory, and shall pay for the cost of additional lines and changes in listings.

5. The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any Tenants or used for any purpose other than for ingress to and egress from their respective Premises. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and the Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its Tenants; provided, that nothing herein contained shall be construed to prevent such access to persons with whom the Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. No Tenant and no employee or invitees of any Tenant shall go upon the roof of the Building.

6. Tenant shall not alter any lock or install any new or additional lock or any bolts on any door of the Premises.

7. The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose employees or invitees, shall have caused such breakage, stoppage or damage.

8. Tenant shall not overload the floor of the Premises or mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof.

9. No furniture, freight or equipment of any kind shall be brought into the Building without the consent of Landlord which consent shall not be unreasonably withheld or delayed and all moving of the same into or out of the Building shall be done at such time and in such

36

manner as Landlord shall designate. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on wood strips of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause and shall damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of Tenant.

10. Tenant shall be permitted to employ its own cleaner in addition to the janitor of Landlord for the purpose of cleaning the Premises. Except with the written consent of Landlord, which shall not be unreasonably withheld, no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the same. Tenant shall not cause any unnecessary labor or materials expenses to be incurred by Landlord in maintaining the Building by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to any Tenant for any loss of property on the Premises, however occurring, or for any damage done to the personal effects of any Tenant by the janitor or any other employee or any other person. Janitor service shall include ordinary dusting and cleaning by the janitor assigned to such work and shall not include cleaning of carpets or rugs, except normal vacuuming, nor moving of furniture or other special services.

11. Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to the Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other Tenants or those having business therein, nor shall any animals or birds be brought in or kept in or about the Premises or the Building.

12. No cooking shall be done or permitted by any Tenant on the Premises, nor shall the Premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable or immoral purposes.

13. Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Landlord.

14. Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced. No boring or cutting for wires will be allowed without the consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

15. Each Tenant, upon the termination of such Tenant's tenancy, shall deliver to the Landlord the keys or offices, rooms and toilet rooms which shall have been furnished the Tenant or which the Tenant shall have made, and in the event of loss of any keys so furnished, shall pay the Landlord therefore.

16. No Tenant shall lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by the Landlord. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the Tenant by whom, or by whose contractors, employees or invitees, the damage shall have been caused.

17. No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as shall be designated by the Landlord.

18. On Saturday, Sunday and legal holidays, and on other days between the hours of 6:00 p.m. and 8:00 a.m. the following day, access to the Building or the halls, corridors, elevators or stairways in the Building, or to the Premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified. The Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or other commotion, the Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the Tenants and protection of property in the Building and the Building.

19. Tenant shall see that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other Tenants or occupants of the Building or Landlord.

20. Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

21. The requirements of Tenant will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee will admit any person (Tenant or otherwise) to any office without specific instructions from the Landlord.

22. No vending machine or machines of any description shall be installed, maintained or operated upon the Premises without the written consent of the Landlord.

23. Landlord shall have the right, exercisable without notice and without liability to Tenant, to change the name and the street address of the Building of which the Premises are a part.

24. Tenant shall not disturb, solicit, or canvass any occupant of the Building and shall cooperate to prevent same.

38

25. Without the written consent of Landlord, Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant except as Tenant's address.

26. Landlord shall furnish heating and air conditioning to the common areas during the hours of 8:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 1:00 p.m. Saturday. Landlord shall not be responsible for any interruption or curtailment of utility service due to an energy crisis or any act or regulation of the utility companies or any governmental agency, nor shall Tenant be entitled to any deduction from rent or any other relief from its obligations under this Lease as a result thereof.

27. The word "Building" as used herein means the Building of which the Premises are a part, and related parking and other common areas.

*The rest of this page is left intentionally blank*

## EXHIBIT "D"

## ADDENDUM

The following terms are incorporated into and made a part of the Lease dated February 1, 2012 for reference purposes ("Lease"), between Manor Park, LLC ("Landlord") and G&K Foundation, a non-profit Public Benefit Corporation DBA CareFirst RX ("Tenant") to which these are attached. In the event of a conflict between the terms of the Lease and the terms of this Addendum, the terms of this Addendum shall control for all purposes.

1. **Due At Signing:** Tenant shall provide the Landlord with a check in the amount of Seven thousand Four hundred Twenty-Four dollars and 80/100th ($7,424.80) to be allocated as follows:

   a. First month's rent:   $3,547.80

   b. Security Deposit:   $3,877.00

2. **Utilities:** Landlord shall place the separately metered electricity for the Premises in their name for the duration of the Term, unless otherwise specified by the Landlord at anytime during the Term, for any reason, by providing 30 days notice to the Tenant. Landlord shall pay the utility bill directly to the utility provider and bill the Tenant for their proportionate share of each utility bill on a monthly basis. Tenant's proportionate share of the electrical utility bill for the Premises have been calculated as a fraction, the numerator of which shall be the number of gross square feet of area within the Leased Premises (1,314 square feet) and the denominator of which shall be the gross square feet of entire suite #102, including the rear office area (1,594 square feet), plus a 10% premium as the primary user of the suite and utilities. Tenant's proportionate share of the utility reimbursement is equal to ninety and 67/100ths percent (90.67%) (hereinafter referred to as "Utility Reimbursement"). The Utility Reimbursement shall be paid in addition to the Rent pursuant to the terms outlined in Section #5 of the Lease regarding Net Rent.

3. **Rental Abatement:** Provided Tenant is not in default under the terms of the Lease, Tenant shall receive months 2, 12, 24 and 36 free of Base Rent only. If Tenant is in default at any time prior to the expiration of the rental abatements mentioned above, Landlord reserves the right to withdraw and void any and all remaining free rental periods.

4. **Tenant Improvements:** Tenant is responsible to hire, oversee and manage any and all tenant improvement work performed on the Premises to ensure it is completed in a professional and timely manner as well as to minimize the disturbance to other tenants in the building. Whenever possible, construction work is to be performed before 8am or after 5pm during weekdays and anytime on Saturday and Sunday. Although Tenant will use its best efforts to restrict construction work to the times and days as indicated in this paragraph, Tenant shall not be restricted in setting whatever construction schedule is deemed necessary to complete the Improvements within 45 days. Copies of all required permits from the city and other agencies, if applicable, are to be delivered to the Landlord prior to commencement of any work.

Tenant shall be responsible to pay vendors, contractors, etc. directly for all work completed and provide Landlord with copies of all such receipts, invoices, permits and executed lien releases. Upon receipt of all necessary items, Landlord shall reimburse Tenant within ten (10) business days for all expenses associated with the improvements up to an amount not to exceed fourteen thousand five hundred dollars ($14,500.00), hereinafter "(TI Allowance"). Specifically excluded herein are all tenant trade fixtures which Landlord is not responsible to reimburse Tenant for. For all intents and purposes, office cabinetry and utility installations shall not be defined as Trade Fixtures.

If the improvement costs exceed the maximum TI Allowance provided by the Landlord herein, for any reason, the Tenant agrees to pay any and all such additional expenses above the TI Allowance limit required to complete the improvements directly to the contractor(s) as and when due. Failure to satisfy any and all related invoices associated with the improvement process will be considered an event of default pursuant to the terms of this Lease.

5. **Rental Increase:**     Rent shall be increased in accordance with the following schedule:

| Term Year | Rent / Sq. Ft. | Monthly Base Rent |
|---|---|---|
| April 1, 2012 | $2.70 | $3,547.80 |
| April 1, 2013 | $2.70 | $3,547.80 |
| April 1, 2014 | $2.78 | $3,654.23 |
| April 1, 2015 | $2.86 | $3,763.86 |
| April 1, 2016 | $2.95 | $3,876.78 |

6. **Parking:** Tenant shall have the option to lease reserved parking spaces in the subterranean garage at a current rate of fifty dollars ($50.00) per space per month.

7. **Signage:** Tenant, at Tenant's expense, shall be responsible for lobby directory and suite entry signage using Landlord's preferred vendor. Tenant shall have the option of installing one (1) additional sign in the front or rear of the building, or modifying the existing signage, at Tenant's sole cost and expense. All additions or modification to such signage require Landlord's written approval prior to implementation, which shall not be unreasonably withheld.

**By Landlord:**
Manor Park, LLC

By: _David Gouz_
David Azouz, Manorhouse Properties 1, LLC
Managing Member

Date: _2/22/12_

**By Tenant:**
**G&K Foundation, a non-profit Public Benefit Corporation, DBA CareFirst RX**

By: _____
Robert Gevorkian

Its: _CEO_

Date: _2-20-12_

41



UNICARE HEALTH SERVICES, INC.
DBA UNICARE PHARMACY
(626)793-7771
301 S FAIR OAKS AVE NO. 104
PASADENA, CA 91105

3506

15-66/1220
212

Date 2-20-12

Pay to the Order of _Manor Park LLC_    $ 7,424.00

_Seven Thousand Four Hundred Twenty Four_ 00/100 Dollars

Bank of America
ACH R/T 121000358

For _Rent_

⑈122000661⑈:3506⑈022127⑈ ⑈0544⑈

UNICARE HEALTH SERVICES, INC.
DBA UNICARE PHARMACY
(626)793-7771
301 S FAIR OAKS AVE NO. 104
PASADENA, CA  91105

3506

16-66/1220
212

Date 2-20-12

Pay to the Order of   Manor Park LLC   $ 7,924 80

Seven Thousand Four Hundred Twenty Four 80/100   Dollars

**Bank of America**
ACH R/T 121000358

Customer Since 2003

For   Rent

⑆12200066⑆: 3506 ⑈02127⑈ 10544⑈

## GUARANTY

In consideration of and as a material inducement to, Manor Park, LLC, hereinafter ("Lessor"), and G&K Foundation, a non-profit Public Benefit Corporation, DBA CareFirst RX, hereinafter ("Lessee"), executing a Lease dated February 1, 2012 ("Lease") concerning the premises commonly known as Suite #102 at 7325 Medical Center Drive, in West Hills, CA 91307 ("Premises") wherein Lessor will lease the Premises to Lessee, and;

WHEREAS, Robert Gevorkian, an individual hereinafter referred to as ("Guarantor") has a financial interest in Lessee, and Guarantor hereby on behalf of itself, its successors and assigns, unconditionally covenant and agrees with Lessor, its successors and assigns, if a default shall at any time under the Lease be made by Lessee, its successors and assigns, in the payment of any monthly installment of rent, or additional rent, or in the performance of any of the terms, covenants and conditions of the Lease, and if the default shall not have been cured within the time specified in the Lease for curing the same, then Guarantor shall pay on demand in cash all rent and additional rent then due and all damages incurred by Lessor as a result of or arising out of any such default by Lessee.

THIS GUARANTY is an absolute and unconditional guaranty of payment and performance. It shall be enforceable against Guarantor, its successors and assigns, without the necessity for any suit or proceedings by Lessor against Lessee, its successors and assigns, and without the necessity of any notice of non-payment, non-performance or non-observance or any notice of acceptance of this Guaranty or any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waive. Guarantor agrees that the validity of this Guaranty and the obligations of the Guarantor shall in no way be terminated, affected or impaired by reason of the assertion or the failure or delay to assert by Lessor against Lessee, or Lessee's successors and assigns, any or partial exercise of any right, power or privilege under this Guaranty.

THIS GUARANTY shall not be affected and the liability of the undersigned shall not be extinguished or diminished by Lessor's receipt, application or release of security for the performance and observation of the covenants and conditions in the Lease to be performed or observed by Lessee, its successors and assigns; by the cessation from any cause whatsoever of the liability of Lessee, its successors and assigns; by reason of sums paid or payable to Lessor from the proceeds of any insurance policy or condemnation award; by any non-liability of Lessee under the Lease for any reason, including any defect or defense which may now or hereafter exist in favor of Lessee; amendments, indulgences, modifications, transfers or assignments in whole or in part of the Lease by Lessor, whether or not notice thereof is given to the Guarantor and whether or not Guarantor's consent thereto is obtained. This Guaranty is of payment and not of collection; it is one of active performance and not one of surety ship for damages or otherwise. This Guaranty extends to any and all liability, which Lessee has or may have to Lessor by reason of matters occurring before the execution of the Lease or the commencement of the Term of the Lease, or by matters occurring after the expiration of the Term of the Lease. Guarantor agrees they shall have no rights of indemnification or subordination against Lessee by reason of any indebtedness or sums due to Guarantor, unless and until the Lease is performed to the satisfaction of Lessor. Guarantor agrees they shall not assert any claim which it has or may have against the Lessee, including any claims under the Guaranty, until the obligations of Lessee under the Lease are fully

1

satisfied and discharged. The liability of Guarantor is co-extensive with that of Lessee and also joint in several.

LESSOR'S ACCEPTANCE of a note or additional collateral of Lessee or Guarantor shall not be the full cash payment or the active and primary performance required herein. This Guaranty is given in addition to all other guaranties, which may pertain to Lessee's indebtedness and is not subordinate to any other guaranties. Lessor's rights under all guaranties, including the Guaranty, shall be cumulative and independently enforceable. It shall not be a condition to the enforcement of this Guaranty that any other guaranties be sorted by Lessor. Should Lessor be obligated by any bankruptcy or other law to repay to Lessee or to Guarantor or to any trustee, receiver or other representative of either of them, any amounts previously paid to Lessor, its successors and assigns, this Guaranty shall be reinstated in the amount of such repayments.

GUARANTOR AGREES they will, at any time and from time to time, within ten (10) business days following written request by Lessor, execute, acknowledge and deliver to Lessor an estoppel certificate certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and stating such modifications) and making such additional statements with respect to this Guaranty and Guarantor's obligations hereunder as Lessor shall in good faith request. Guarantor agrees that Lessor may utilize for such purpose any estoppel tender to Lessor. Guarantor agrees that such certificate may be relied on by a mortgagee or Lessor or prospective mortgagee or lessor of the property or of all interest therein.

GUARANTOR REPRESENT and warrant that:
a) It is not insolvent, and that there are no limitations or prohibitions to time enforcement of the Guaranty;
b) It is immediately benefited by the Lease, and Lessor's leasing of the Premises to Lessee thereunder;
c) If Guarantor are shareholders, members or other holder of any legal or equitable interest in Lessee, it shall not transfer any stock or other interest in Lessee without obtaining Lessor's prior written consent, and if such consent is given, Guarantor shall immediately obtain guaranties in this form running from all the transferees to Lessor;
d) The term of existence of Lessee is and shall remain longer than the Term of the Lease; and
e) The execution, delivery and performance of this Guaranty are duly authorized and do not require the consent or approval of any individual, body or entity.

GUARANTOR AGREES that all shares of stock and rights of and all oilier rights or interests in and to Lessee which Guarantor may own, and all debts, rights and other claims which may be or becomes due to Guarantor from Lessee, shall be subordinate to this Guaranty and to all other guaranties which may be given by Guarantor to Lessor from time to time. Specifically, and not by way of limitation of the foregoing, Guarantor agrees that:

a) It shall not collect sums due under any such stock, interest, debts, rights or claims or commence any proceedings to collect such sums unless and until all of Lessee's indebtedness is paid in full;

2

b) It shall not cause or allow any new shares of Lessee's stock or other interests in Lessee to be issued or allow any delivery of such shares; and

c) It shall enter into such further subordinations as Lessor may reasonably require.

AS FURTHER inducement to Lessor to make and enter into the Lease and in consideration thereof, Guarantor covenants that in any action or proceeding brought on, under or by virtue of this Guaranty (a) Guarantor hereby waives trial by jury, (b) Guarantor agrees that any such action or proceeding shall have its venue in Los Angeles County, California, or the United States District Court having jurisdiction over Los Angeles County, California; And (c) Guarantor agrees to submit to the jurisdiction of any court described in clause (b). Guarantor agrees that Lessee shall act as Guarantor's agent for service of process in any action or proceeding brought under, or by virtue of this Guaranty, and Guarantor and Lessee agrees to take any and all action to appoint Lessee as Guarantor' agent for service of process.

IF ANY PORTION or application of this Guaranty is invalid, unenforceable or illegal for any reason, the parties agree that such invalid unenforceable or illegal portion or application shall not be deemed to affect the remainder of this Guaranty.

GUARANTOR' OBLIGATIONS and liabilities under this Guaranty are absolute, independent of and regardless of any defenses, counterclaims, set-offs, cross-claims or other claims which Guarantor may now have or at any time hereafter have against Lessee or Lessor or any other person, firm, corporation for any reason whatsoever. Guarantor further agrees that any such defenses, counterclaims, set-offs, cross-claims or other claims which Guarantor may have, or at any time hereafter have, shall not be enforceable in any independent action which would interfere with or in any way reduce the obligations owed to Guarantor under the Guaranty. Guarantor unconditionally waive; (a) any right to assert or claim that Guarantor is exonerated by any action taken by Lessor which impairs Guarantor' rights to be subrogated to Lessor's rights against Lessee; (b) the right to enforce any remedies that Lessor now has, or later may have, against Lessee until such time as all indebtedness of Lessee (relative to Lessor) has been satisfied; (c) any right to participate in, proceed against, or exhaust any security now or later held by Lessor; (d) all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty; (e) all notices of the existence, creation or incurrence of new or additional obligations under the Lease; (f) any duty of Lessor to advise Guarantor of any information known to Lessor regarding the financial condition of Lessee; (g) the right to proceed against Lessee or pursue any particular remedy in Lessor's power and; (h) any defense by reason of any disability of Lessee and any other defense based upon the termination of Lessee's ability to perform under the Lease from any cause. Guarantor expressly waive the provisions of Sections 2810, 2819, 2845, 2848 and 2805 of the Civil Code of California, as a recodified from time to time, except to the extent such rights of Guarantor or obligations of Lessor are otherwise expressly addressed in this Guaranty.

THE PROVISIONS of the Lease may be altered, affected, modified amended, or changed by agreement between Lessor and Lessee at any time, or by course of conduct, without the consent or without notice to Guarantor, including, without limitation, any extension of the Term pursuant to the Lease or otherwise. This Guaranty shall guaranty the performance, by Lessee and its successors and assigns, of the Lease so altered, affected modified, amended or changed. An assignment of the Lease or sublease of all or any portion of the Premises (whether or not in compliance with the Lease) shall not

3

affect this Guaranty or Guarantor' liability and obligations hereunder. If Lessor disposes of, sells, transfers, assigns, hypothecates or otherwise conveys its interest in the Lease, or any part thereof. "Lessor" as used in this Guaranty shall mean Lessees successors. The word "successor" is used herein in its most comprehensive sense and includes any assignee, transferee, personal representative, heir or other person or entity succeeding lawfully, and pursuant to the provisions of the Lease to the respective rights or obligations of either party.

**IN THE EVENT** of the rejection or dissafirmance of the Lease by Lessee or Lessee's Trustee in Bankruptcy pursuant to applicable bankruptcy law or any other Law affecting creditors' rights. Guarantor will and does hereby (without the necessity of any further agreement or act) assume all obligations and liabilities of Lessee under the Lease as if (a) Guarantor were originally named Lessee under said Lease and (b) there has been no rejection or dissafirmance. Guarantor will confirm such assumption in writing at the request of Lessor upon or after such rejection or dissafirmance and Guarantor shall upon such assumption (to the extent permitted by Law) have all the rights of Lessee under the Lease.

**IN THE EVENT** of any legal action or proceeding brought by Lessor against Guarantor or Lessee arising out of the Lease or this Guaranty, Lessor shall be entitled to recover its reasonable attorneys' fees and costs incurred in such action. Such amount shall be included in any judgment rendered in any action proceeding.

IN WITNESS WHEREOF, Guarantor acting herein in its own personal and individual capacity has executed this Guaranty this _2 0_ day of February, 2012.

<u>GUARANTOR</u>

**Robert Gevorkian**

Social Security Number: _6 0 5 - 6 6 - 0 5 8 2_

Drivers License Number: _B 6 3 5 0 7 4 3_

By: _____
Robert Gevorkian

4

State of California
County Of Los Angeles

On February 20, 2012, before me, Sandra J Garbutt, Notary Public,
personally appeared Robert Gevorkian ~~personally known to me (or~~ proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledge to me that he/she/they executed the same in his/her/their
authorized capacit(ies), and that by his/her their signature(s) on the instrument, the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

I Certify under PENALTY OF PERJURY under the laws of the state of California that the foregoing
Paragraph is true and correct

WITNESS my hand and official seal.

_____ (SEAL)
Notary Public

> SANDRA J. GARBUTT
> Commission # 1887969
> Notary Public - California
> Los Angeles County
> My Comm. Expires May 1, 2014

5

# EXHIBIT B

### FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement (this "Amendment") is made and entered into as of the Effective Date (as defined in Section 9 hereof), by and between HEALTHCARE REALTY SERVICES INCORPORATED, a Tennessee corporation, as agent for HR OF CALIFORNIA, INC., an Alabama corporation (the "Landlord"), and G&K FOUNDATION, a non-profit Public Benefit Corporation d/b/a CareFirst RX (the "Tenant").

### RECITALS:

WHEREAS, Tenant and Manor Park, LLC ("Prior Landlord") have previously entered into that certain Lease Agreement dated as of February 1, 2012 (the "Lease"), for certain premises currently designated as Suite 102 containing 1,314 rentable square feet (the "Premises") located in that certain medical office building currently known as Park Hill Medical Plaza and located at 7325 Medical Center Drive, West Hills, California 91307 (the "Building");

WHEREAS, Landlord is successor in interest to Prior Landlord as landlord under the Lease.

WHEREAS, Landlord and Tenant desire to alter, amend, modify or confirm certain provisions of the Lease in accordance with the provisions of this Amendment.

NOW, THEREFORE, in consideration of the foregoing, the mutual promises and covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Incorporation of Recitals; Definitions**. The Recitals set forth above are hereby incorporated into this Amendment as if set forth herein in full. All capitalized terms not defined in this Amendment shall be deemed to have the meanings given such terms in the Lease.

2. **Extension Term**. The Lease Term is hereby extended for a term of five (5) years (the "Extension Term"). The Extension Term has a commencement date of April 1, 2017, and will expire on March 31, 2022. Upon the Effective Date, the Extension Term shall be deemed a part of the "Lease Term" as defined in the Lease. As of the Effective Date, Landlord and Tenant acknowledge and agree that Tenant shall have one (1) remaining option to renew the Lease for an additional five (5) year term pursuant to the terms of the Lease.

3. **Base Rent**. Sections 1(H), 1(I), 1(J), and Section 5 of the Lease governing Base Rent are generally amended to provide that Tenant shall pay Base Rent to Landlord as follows for the Extension Term:

| Lease Period | Annual Base Rent Per RSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| 4/1/17 - 3/31/18 | $43.20 | $56,764.80 | $4,730.40 |
| 4/1/18 - 3/31/19 | $44.50 | $58,473.00 | $4,872.75 |
| 4/1/19 - 3/31/20 | $45.83 | $60,220.68 | $5,018.39 |
| 4/1/20 - 3/31/21 | $47.21 | $62,034.00 | $5,169.50 |
| 4/1/21 - 3/31/22 | $48.62 | $63,886.68 | $5,323.89 |

Note – the Lease uses the terms "Base Rent" and "Fixed Rent" interchangeably. This Amendment shall use the term Base Rent.

1

4.  **Base Year**.  As of April 1, 2017, Section 1(L) of the Lease is generally amended to provide that the Base Year for the Extension Term shall mean the calendar year from January 1, 2017 through December 31, 2017.

5.  **Acceptance of the Premises**.  Tenant agrees that no representations, statements or warranties expressed or implied have been made by or on behalf of Landlord with respect to the Premises except as contained in the Lease, as amended by this Amendment.  Tenant is accepting the Premises in its current "As-Is" condition.  Tenant is not receiving a tenant improvement allowance during the Extension Term.

6.  **Ratification of the Lease**.  Except as specifically set forth in this Amendment, the parties hereto hereby agree that the Lease is unmodified and in full force and effect, and further hereby ratify, affirm and confirm the Lease as amended by this Amendment.  From and after the Effective Date, the term "Lease" shall be deemed to mean and include the Lease as amended by this Amendment.

7.  **Brokerage Commissions**.  Tenant represents and warrants to Landlord that Tenant has had no dealings with any real estate broker or agent other than Colliers International ("Landlord's Broker") in connection with the negotiation of this Amendment, and that Tenant knows of no other real estate broker or agent who is or might be entitled to a commission in connection with this Amendment.  Tenant hereby agrees to indemnify the Landlord for any breach of the warranty given by Tenant in this Section. Landlord shall pay a commission to Landlord's Broker in connection with this Amendment in accordance with a separate written commission agreement executed between Landlord and Landlord's Broker.

8.  **Counterparts**.  This Amendment may be executed in more than one counterpart, and delivered via facsimile or electronic mail.

9.  **Effective Date**.  The "Effective Date" of this Amendment shall mean the date on which the Amendment is signed by the last party.

[Balance of page intentionally blank]

4842-2509-9089.2

**THE PARTIES HERETO** have executed this Amendment in duplicate as of the day and year written below such parties' signatures.

LANDLORD:

HEALTHCARE REALTY SERVICES
INCORPORATED, as agent for
HR OF CALIFORNIA, INC.

By: _Amy Polcyn_

Name: _Amy Polcyn_

Title: _Vice President_

Date: _12/7/17_


TENANT:

G&K FOUNDATION

By: _____

Name: _____

Date: _11-13-17_


## CONSENT OF GUARANTOR

The undersigned, Robert Gevorkian, hereby consents to the terms and conditions of this First Amendment to Lease Agreement and hereby acknowledges that the Guaranty of Lease previously signed by Robert Gevorkian in connection with the Lease will remain in full force and effect.


By: _____

Name: Robert Gevorkian

3